IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-1678

MELIH TAN and PAMELA TAN,

Plaintiffs,

v.

DET-CO, INC.,
RINO SUPPLY CO, INC.,
GARY WEST,
JARED PENMAN,
FIREHOUSE ORGANICS CENTRAL, LLC,
FIREHOUSE ORGANICS NORTH, LLC,
AND FIREHOUSE ORGANICS SOUTH, LLC,

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

1.     Upon knowledge with respect to themselves and their own acts and information

and belief as to all other matters, Plaintiffs Melih Tan and Pamela Tan, husband and wife

(jointly and severally, "Plaintiffs" or the "Tans") file this Complaint against Defendants Det-CO,

Inc. ("Det-CO"), Rino Supply Co. Inc. ("Rino"), Gary West ("West"), Jared Penman

("Penman"), Firehouse Organics Central, LLC ("Firehouse Central"), Firehouse Organics North,

LLC ("Firehouse North"), and Firehouse Organics South, LLC ("Firehouse South"), as follows:

## I.

## PRELIMINARY STATEMENT

2.     This case is being pursued because the Defendants West and Penman (the

"Individual Defendants") have asserted exclusive ownership and control over two medical

marijuana businesses and related assets—including real property and improvements being used

as a multi-million dollar "grow" facility for one of the businesses—in breach of their agreements

or understandings to share the equity with Plaintiffs and other investors and the Individual

Defendants' refusal to otherwise address the  unjust enrichment they have enjoyed at Plaintiffs'

expense.

3.     The other Defendants named in this Complaint are the holding and/or operating

entities which have been usurped by the Individual Defendants.

## II.

### THE PARTIES

4.     Plaintiff Melih Tan is an individual citizen of the State of Florida who also resides

in that state.

5.     Plaintiff Pamela Tan is an individual citizen of the State of Florida who also

resides in that state.

6.     Defendant Jared Penman is an individual citizen of the State of Colorado.

7.     Defendant Gary West is an individual citizen of the State of Colorado.

8.     Defendant Det-CO, Inc. is a Colorado corporation formed on December 31, 2013.

It maintains a principal office at 950 S. Cherry Street, Suite 300, Denver, CO 80246, United

States. It may be served through its registered agent Kenneth Morris at 1285 Yellow Pine Ave.,

Boulder, CO 80304.

9.     Defendant Rino Supply Co, Inc. is a Colorado corporation formed on November

25, 2009. It maintains a principal office at 3100 Blake St, Denver, CO 80205, United States. It

may be served through its registered agent Lawrence Gustafson at 950 S Cherry St, Suite 300,

Denver, CO 80246, United States.

10.     Defendant Firehouse Organics Central, LLC is a Colorado limited liability company formed on February 26, 2010. Its member(s) are citizens of the State of Colorado. Its former name is Bryant Street Wellness Center, LLC. It maintains a principal office at 543 N. Bryant Street, Denver, CO 80204. It may be served through its registered agent Kenneth Morris at 1285 Yellow Pine Ave., Boulder, CO 80304.

11.     Defendant Firehouse Organics North, LLC is a Colorado limited liability company formed on January 19, 2010.  Its member(s) are citizens of the State of Colorado. Its former name is The Health Joint, LLC. It maintains a principal office at 4401 Zenobia Street, Denver, CO 80212. It may be served through its registered agent Kenneth Morris at 1285 Yellow Pine Ave., Boulder, CO 80304.

12.     Defendant Firehouse Organics South, LLC is a Colorado limited liability company formed on September 1, 2009. Its member(s) are citizens of the State of Colorado. Its former name is Colorado Photosynthetic Medical Research Facilities, LLC. It maintains a principal office at 3111 W 38th Avenue, Denver, CO 80211. It may be served through its registered agent Michael Leibowitz at 3267 Newton St, Denver, CO 80211.

### III.

### JURISDICTION AND VENUE

13.     This Court has diversity subject matter jurisdiction over this case under 28 U.S.C. §1332(a), because the Plaintiffs are citizens of the State of Florida and all Defendants are citizens of the State of Colorado. The amount in controversy exceeds $75,000, computed without regard to any setoff or counterclaim to which the defendants may be adjudged to be entitled, and exclusive of interest and costs.

14.     Venue is proper in this Court under 28 U.S.C. §§ 1391(a) (2) (the judicial district where a substantial part of the events or omissions giving rise to the claim occurred) and/or 28 U.S.C. §1391(c) (the judicial district in which the Individual Defendants reside and the judicial district in which the other Defendants are subject to personal jurisdiction).

## IV.

## FACTUAL BACKGROUND

**A.      Plaintiffs Advance One Million Dollars To Create The Opportunity To Buy The Firehouse Businesses**

15.     In October 2010, Thomas Waldron ("Waldron"), an entrepreneur and promoter, entered into a contract with Kim Gataeno ("Gaetano") providing for the purchase and sale of a fifty percent equity interest in and management control of a collection of MMJ businesses and related assets located in Denver county, Colorado for a total of $1.5 million (the "Original Purchase Agreement").

16.     The operating entities owned or controlled by Gataeno which were the subject of the Original Purchase Agreement (the "Firehouse Defendants") were: defendant Firehouse Central (then doing business as  Bryant Street Wellness Center, LLC); defendant Firehouse North (then doing business as The Health Joint, LLC); and defendant Firehouse South (then doing business as Colorado Photosynthetic Medical Research Facilities, LLC).

17.     On or about December 11, 2010, the Original Purchase Agreement was amended to reduce the purchase price to $1.25 million and to add an entity as the purchaser, which would facilitate the residency and other requirements for obtaining licensing approval for the transaction and ultimately allow for participation by Plaintiffs as owners of the businesses.

18.     Recognizing the substantial opportunity for profit in owning the businesses and the potential for future development of the businesses and other transactions in the future, the

Tans advanced $1 million towards the $1.25 million purchase price, which was placed in escrow with Gaetano's lawyer. The balance of the funds was provided by others, including Waldron's son or entities he owned or controlled ("Tom Jr.").

19.     Plaintiff Pamela Tan established residency in Colorado and applied for a Colorado license to be employed in the MMJ business (which she eventually received in 2012).

20.     But, in late December 2010—before the contract closed—Gaetano broke escrow to use over $725,000 of the purchase funds to buy real estate and placed title to the real estate in an entity outside the Firehouse entities which were the subject of the purchase agreement.

21.     Gataeno also purported to declare the contract "null and void" due to, among other things, alleged misrepresentations by Waldron to Gaetano and a failure to meet the licensing requirements of Colorado law at the time the contract was executed.

22.      Litigation ensued over Gataeno's actions in the City and County of Denver District Court bearing case number 11-CV-2231 (the "Gataeno Litigation").

23.     After holding a trial in July 2012 and considering numerous exhibits and the testimony of sixteen witnesses, the Colorado District Court found that the Tans and others were the source of $1.1 million of the $1.25 million placed in escrow under the Original Purchase Agreement. On September 26, 2014, the Court of Appeals reversed and remanded the case to the District Court based on erroneous findings by the District Court concerning the plaintiff and its successor entities and its erroneous interpretation of Colorado licensing law.  However, the Court of Appeals did not reverse the District Court's finding of fact concerning the Tans being the source of the bulk of the purchase price.

24.     Thus, there is no question that the one million dollars advanced by the Tans was primarily responsible for creating and maintaining the opportunity to buy an interest in the Firehouse businesses from Gataeno.

**B.     Plaintiffs Advance Over $350,000 To Help Create The Opportunity To Buy The Firehouse Businesses**

25.     Meanwhile, as the Gataeno Litigation was moving forward, Waldron started working with defendant Penman to assist in the development and growth of his own MMJ business, defendant Rino.

26.     Waldron found an old greenhouse facility located at 10452 Isabelle Road, Lafayette, Colorado 80026 (the "Isabelle Property") which could yield substantial value to the Rino operation as a "grow" facility if Waldron and Penman could obtain two things: money and the day-to-day presence of a trustworthy manager with construction experience to oversee the project, clean up the property, and install improvements.

27.     The need for money was met by obtaining funds from investors—like the Tans— in exchange for an eighty percent share of the combined Rino business and Isabella Property (with Penman to retain the other twenty percent)(the "80/20 Split").

28.     The need for a day-to-day construction manager was met by inviting defendant West to come to Colorado and work with Penman at Rino and on the Isabelle property. West and Waldron had been close personal friends for over 25 years and Waldron trusted him implicitly. West readily agreed.

29.     In April 2012, New Alternatives Consulting, LLC ("NAC")—an entity owned and controlled by Tom Jr.—entered into a lease of the Isabelle Property with an eye towards developing the site and then buying it. The total rent due under the life of the lease was $120,000 payable in 24 installments of $5,000. The lease term ended on July 23, 2014.

30.     Defendant West and Tom Jr. also formed Deep Blue Enterprises, LLC ("Deep Blue") to further the efforts of the venture, with West and Tom Jr. each holding a fifty percent membership interest in Deep Blue and serving as its co-managers (meaning that both needed to agree to bind the entity). Defendant West was also provided a fifty percent interest in NAC. On May 21, 2012, Deep Blue entered into a contract to purchase the Isabella Property for $1,650,000, with an $110,000 earnest money deposit due by October 1, 2012 and the balance by July 23, 2014.

31.     In addition to rent under the lease and the earnest money deposit under the purchase contract, NAC and Deep Blue were responsible for paying all costs and expenses associated with the Isabelle Property, including taxes, once they had executed the lease and the purchase contract. NAC and Deep Blue obtained the funds to do so from loans or advances by investors, including the Tans. In fact, the Tans directly or indirectly through their family's entity, Evren Partners, LLC, advanced over $350,000 for those expenses and others relating to the Rino/Isabelle Property enterprise.

32.     In August 2013, the Tans wrote an email to West telling him "how very thankful and appreciative we are for the incredible job you have done with the Isabelle Grow." They continued:

> We cannot fully realize all that has gone into achieving the results you have reaped.  Simply juggling the money has been a full time task alone, and things could not have been accomplished without your tuning, tweaking, and shuffling all the moving financial pieces to the great puzzle of rolling that big old dinosaur of a greenhouse into the profit machine it has now become.  No one else could have handled the control panel as you have done—expertly and without complaint. You have shown your patience, talent and wisdom in accomplishing a very difficult task, and produced truly staggering results.  We are deeply grateful for your efforts.

West responded by acknowledging and praising the Tans' investment, stating:   "**Thank you. The real thanks is what you, Pam, and Tom has [sic] done with guidance and supplying an endless amount of money.   I know how hard that task is and was.   It is called team work**." (Bold added)

33.     Thus, as with the one million dollar advance for the Gataeno transaction, there is no question that the Tans' money was instrumental in developing and maintaining the Isabelle Property.

**C.     The Individual Defendants/Det-CO Buy The Firehouse Defendants From Gataeno With No Money Of Their Own And Promises To Recognize The Tans' Investment After the Closing**

34.     By the end of 2013, Waldron and Gataeno decided to try and bury the hatchet, go back to the drawing board, and restructure the transaction involving the Det-CO/Firehouse businesses and related assets. The parties agreed that the purchase and sale should be increased from fifty to one hundred percent. The parties also recognized that they would need to work with the Colorado Marijuana Enforcement Division ("MED") and the Department of Excise and Licensing in the City of Denver (the "DEL") to obtain advance licensing approval for the transfer.

35.     Waldron, the Tans, West, and Penman discussed these challenges and agreed that: (a) West and Penman should represent the purchaser in connection with seeking approval for the initial purchase of the Det-CO/Firehouse businesses; and (b) they should disclose to the MED and DEL up front that some investors would be seeking approval from the regulators after West and Penman were approved and the initial purchase had taken place.

36.     West and Penman were chosen because, among other reasons: (a) they were both residents of Colorado and could meet the other requirements for obtaining the licenses; (b) they

were already working together on Rino/Isabelle under the 80/20 Split; and (c) they were known to and trusted by Waldron and some of the investors, including the Tans.

37.     West and Penman therefore agreed with Waldron and Plaintiffs to undertake the approval process for the transaction, to make the disclosures about the investors to the MED and DEL during that process, and then make equity in the business and other assets available to the investors along a similar 80/20 Split, once the closing occurred and guidance from the MED and DEL had been obtained.

38.     On December 31, 2013, West formed defendant Det-CO under Colorado law to act as the purchaser.

39.     On or about January 14, 2014, Gataeno and Det-CO entered into a Stock and Membership Interests Purchase Agreement (the "January Purchase Agreement"). The January Purchase Agreement provided for the purchase by Det-CO "or assigns" of all of the stock and membership interests in the Firehouse Defendants—as well as Star-Tek Holdings, LLC (Star-Tek"),  the entity which had taken title to the real estate purchased with the escrowed funds—for $2.1 million. Over $440,000 of that purchase price was to be set aside to satisfy a judgment held by Thomas Murphy against Gataeno (the "Murphy Judgment") which could interfere with the purchase and sale.

40.     Defendant West signed the January Purchase Agreement as the President of  Det-Co "or assigns." Moreover, as anticipated by members of the venture, the January Agreement also specifically addressed the need to obtain approvals from the MED and the DEL for a transfer of the Firehouse Defendants. Section 1.6 of the January Purchase Agreement underscored that the agreement was "contingent upon governmental approval for the change of ownership of the Company, any financing associate therewith, and the Associated Key Medical

Marijuana licenses." Section 1.4 of the January Purchase Agreement in turn provided that Det-Co would be "required to make a full and accurate truthful and timely disclosure of all of the sources of financing of the Buyer and all of the principal parties involved in the purchase of Seller's property" to the MED and DEL.

41.     Discussions were undertaken with the MED and DEL for several months, and covered detailed disclosures concerning the investors and the expectations of developing the Det-CO/Firehouse businesses for them once the operation was purchased.

42.     The MED ultimately indicated that it would approve the transaction as long as Waldron and Tom Jr. did not have any direct or indirect ownership or profits participation in any of the licensed MMJ business entities (i.e., the Firehouse Defendants). The regulators did not prohibit the Tans or any of the other investors from holding an interest in the regulated entities or their profits. Nor did the regulators prohibit Waldron or Tom Jr. from holding interests in real estate used by the Firehouse Defendants.

43.     To address the regulators' requirements, on or about May 30, 2014, Gaetano and Det-CO entered into an amended agreement (the "Amended Purchase Agreement") to "separate out" the purchase and sale of the Firehouse Defendants from the purchase and sale of the real estate entities (held by the Pro-Tek and Star-Tek entities). The Amended Purchase Agreement states that the separation was necessary "in order to close on the purchase of the [MMJ business] in a timely fashion." The Amended Purchase Agreement also called for a closing within 72 hours of its approval by the MED.

44.     In order to secure that government approval, Penman and West executed a buyer's affidavit dated July 8, 2014 on behalf of Det-CO and themselves as individuals stating, among other things, that they would not allow Waldron or Tom Jr. to own or profit from the

Firehouse Defendants. This affidavit said nothing about precluding the Tans or the other investors from doing so.

45.     The closing of Det-CO's purchase of the Firehouse Defendants commenced on July 11, 2014 and was completed several days thereafter. Because the original purchase and sale transaction had been split into two tranches, the consideration provided for buying 100 percent of the MMJ business was an agreement to satisfy the Murphy Judgment. That consideration was met through execution of a $535,077.50 promissory note from Det-CO to Murphy, payable at the rate of $10,000 per month.

46.     Neither West nor Penman paid any money to purchase the Firehouse Defendants business and they did not guaranty the payments to be made to Murphy. The Tans, on the other hand, had advanced over one million dollars to lock up the Original Purchase Agreement, which in turn made the Amended Purchase Agreement transaction possible.

47.     The Tans agreed to allow the Firehouse Defendants to be purchased by Det-CO with West and Penman as the original owners of that entity. The Tans reasonably believed West and Penman when they promised that they (and Det-CO) would restructure ownership in the entity to reflect the 80/20 Split agreed to by the parties once the purchase had closed and approvals for such a license transfer were  obtained.

48.     If the Defendants had not made such a commitment, the Tans would have objected to the transaction and sued or otherwise taken actions to stop Det-CO (or West and Penman) from taking title.

**D.      Defendant West Wrongfully Refuses To Close The Isabelle Property Purchase So That It Can Be Purchased By Rino/Penman To The Detriment Of The Tans And The Other Investors**

49.      The closing date for Deep Blue to pay the balance of the purchase price for the Isabelle Property was July 23, 2014 (or two weeks or so after Det-CO closed). Deep Blue was fully prepared to make the payment, having secured up to $2 million in lender commitments for the purchase of the property from seven individuals and entities. Despite having these funds— and the demands of Tom Jr. that Deep Blue go forward with the closing—defendant West suddenly refused to do so.

50.      In fact, the Individual Defendants had caused an entity owned or controlled by Penman (Isabelle I, LLC) to enter into a "back-up" contract in the event Deep Blue did not close as scheduled.

51.      Isabelle I, LLC in turn assigned its right to purchase the Isabelle Property to TCG Assets, Inc. ("TCG Assets") in exchange for TCG Assets' agreement to buy the property and then lease it to defendant Rino, an entity also controlled by Penman, with an option to purchase the property at the end of the lease term (the "TCG Assignment Contract").

52.      On August 12, 2014, as required by the TCG Assignment Contract, TCG Assets and Rino executed a two-year lease of the Isabelle Property with an option to purchase the property for $1,900,000 during the lease term.

53.      Rino then exercised that option in August 2016 and is now the owner of the Isabelle Property.

54.      Thus, defendant West's wrongful refusal to close on the original Isabelle Property contract allowed that property to be stripped away from the Tans and other investors and

provides defendants Rino and the Individual Defendants with a multi-million dollar windfall to the detriment of the Tans.

**E.     The Defendants Refuse To Make Things Right**

55.     Because of: (i) the monies the Tans and other investors advanced for the venture starting in 2010; (ii) West's positions as agent to Waldron, the venture, NAC, and Deep Blue and sub-agent to the Tans and the other investors; (iii) the parties' agreement concerning joint pursuit of the opportunities; and (iv) applicable law, the Defendants owed the Tans and the other investors fiduciary and other duties to treat them fairly, in good faith, with loyalty, and reasonable care and to undertake the purchase transactions for the benefit of the Tans and the other investors.

56.     West assured Plaintiffs on several occasions through 2015 that West and Penman acted the way they did to protect the Tans and the other investors and that the Defendants would make sure the investors received their equity interests or a return of their money, with interest.

57.     It now appears that those assurances—like the conduct itself—were grossly misleading and fraudulent.

58.     All that Plaintiffs have received from the Defendants for Plaintiffs' $1.35 million-plus investment is $5,000—delivered by defendant West in a car in 2015.

59.     The Individual Defendants have failed to transfer title to Plaintiffs or to compensate them for Plaintiffs' million-dollar-plus investments, despite repeated post-purchase assurances by defendant West that they would do so.

60.     Meanwhile, the Individual Defendants, separately and together, have been enriched by several millions of dollars of value from Plaintiffs' investments, to the unfair detriment of the Plaintiffs.

61.     The Isabella Property is now a state-of-the-art facility, worth millions.

62.     The Defendants have packaged the Det-CO/Firehouse businesses with a small grow operation owned by Rino and are offering them for sale for $3.95 million ($3.25 million for the Det-CO/Firehouse businesses and $700,000 for the small grow operation held by Rino).

63.     The Defendants have also pocketed the profits from millions of dollars of annual revenues generated by the Firehouse Defendants, Rino, and the Isabelle Property.

64.     Plaintiffs therefore seek declaratory relief, the imposition of a constructive trust, and/or a transfer of ownership interests in Det-CO/Firehouse, Rino, and the Isabella Property among the Individual Defendants, the Plaintiffs, and others.

65.     Plaintiffs also seek an accounting and disgorgement of profits earned by Det-CO/Firehouse, Rino, and for the Isabella Property during the applicable period.

66.     In addition or in the alternative, Plaintiffs seek restitution under principles of unjust enrichment and/or damages to compensate Plaintiffs for the harms caused by the Defendants' breaches of duty and torts.

67.     Plaintiffs also seek punitive or exemplary damages in such amounts supported by the law and facts.

68.     And, finally, Plaintiffs seek attorney's fees, costs, pre-and-post-judgment interest, and such other interim and final relief available to them under the law and the facts.

## V.

## CONDITIONS PRECEDENT/INCORPORATION/
## ALTERNATIVE ALLEGATIONS

69.     Pursuant to Federal Rule of Civil Procedure 8(d), Plaintiffs plead their claims alternatively or hypothetically, and intend to state as many claims as are supported by the law and facts, regardless of consistency.

70.     All conditions precedent necessary to a recovery by Plaintiffs jointly or severally have occurred, have been performed, have been waived, or have been otherwise satisfied.

71.     All allegations in all paragraphs of this pleading are hereby incorporated into all sections of this pleading as if set forth in full in such sections.

72.     Plaintiffs reserve the right to seek additional relief as discovery and investigation of the facts continues.

## VI.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

73.     An actual, present and justiciable controversy has arisen between Plaintiffs and Defendants concerning Plaintiffs' entitlement and the Individual Defendants' entitlement to ownership or share of ownership in defendant Det-CO (and/or the Firehouse Defendants), defendant Rino, and/or the Isabella Property.

74.     Plaintiffs seek declaratory relief under 28 U.S.C. §2201 and request that the Court declare the parties respective ownership interests in in defendant Det-CO, defendant Rino, and/or with respect to the Isabella Property. This includes without limitation transfer of ownership pursuant to the declaration reached by the Court.

75.     Plaintiffs also seek all necessary or proper relief based on the declaratory judgment or decree which is entered pursuant to 28 U.S.C. §2202 and other applicable law.

## SECOND CLAIM FOR RELIEF
### (Breach of Contracts/Duty of Good Faith And fair dealing)

76.     Plaintiffs on the one hand and the Individual Defendants, defendant Det-CO, and/or defendant Rino jointly and severally are parties to binding contracts under which the

parties agreed (the "Promises") that: (a) the Individual Defendants and Plaintiffs would jointly pursue acquisition and development of the Firehouse Defendants, development of Rino, and acquisition and development of Isabella Property; (b) Plaintiffs would make advances of monies for those common goals; and (c)  the Individual Defendants would receive a twenty percent interest and Plaintiffs and other investors would receive an eighty percent interest in the equity of defendant Det-CO (and/or the Firehouse Defendants), defendant Rino, and/or the Isabella Property.

77.     Plaintiffs have fulfilled their obligations under the contracts by advancing the monies for the opportunities to acquire and develop the Firehouse Defendants' business, to improve defendant Rino,  and/or  to acquire and develop the Isabella Property.

78.     Defendants have failed to full their side of the contract(s) and have breached the contract(s) or their duties of good faith and fair dealing by, among other things: (a) refusing to recognize Plaintiff's equity interests and keeping the interests for themselves; (b) failing to account for the profits received by Defendants from the Firehouse Defendants' business, from defendant Rino's business, and/or from  the Isabella Property; and/or (c) failing to repay Plaintiffs' advances, with interest.

79.     Plaintiffs have been a damaged by Defendants' breaches, for which Plaintiffs seek recovery.

### THIRD CLAIM FOR RELIEF
### (Promissory Estoppel)

80.     Defendants are liable to Plaintiffs under the doctrine of promissory estoppel.

81.     Defendants made the Promises to Plaintiffs and should have reasonably have expected that the promise would induce action or forbearance by Plaintiffs.

82.     Plaintiffs in fact reasonably relied on the Promise to their detriment.

83.     The Promise must be enforced to prevent injustice.

84.     Plaintiffs request entry of such the Court deems appropriate to achieve fairness to all parties in the circumstances of this case.

## FOURTH CLAIMS FOR RELIEF
### (Unjust Enrichment)

85.     Defendants are liable to Plaintiffs under the doctrine of unjust enrichment.

86.     Defendants received substantial benefits at Plaintiffs' expense under circumstances that would make it unjust for the Defendants to retain the benefits without commensurate compensation or restitution to Plaintiffs.

87.     Defendants received the benefits by deviating from the mutual purpose of the parties which led Plaintiffs to advance the funds.

88.     Defendants also received the benefits through improper conduct, including without limitation breach of the Promise, breach of fiduciary duty, and conversion.

## FIFTH CLAIMS FOR RELIEF
### (Breach of Fiduciary Duty)

89.     Defendants owed Plaintiffs fiduciary duties due to either: (a) the trust and confidence the Individual Defendants induced Plaintiffs to place in the Defendants and which the Plaintiffs did in fact justifiably place in them; and/or (b) the Defendants' agency or sub-agency to Plaintiffs.

90.     Defendants breached the duty of care and/or the duty of loyalty and otherwise breached their fiduciary duties to Plaintiffs by, among other things: (a) refusing to recognize Plaintiff's equity interests and keeping the interests for themselves; (b) failing to account for the profits received by Defendants from the Firehouse Defendants' business, from defendant Rino's

business, and/or from the Isabella Property; and/or (c) failing to repay Plaintiffs' advances, with interest.

91.     Defendants have received undue benefits as a result of their breaches of fiduciary duty, for which Plaintiffs seek disgorgement and other available remedies.

92.     Plaintiffs have also been a damaged by Defendants' breaches, for which Plaintiffs seek recovery.

## SIXTH CLAIMS FOR RELIEF
### (Aiding And Abetting)

93.     Each of the Defendants owed and breached Plaintiffs fiduciary and other duties to the Plaintiff.

94.     The other Defendants knowingly participated and substantially assisted in those breaches, which caused damages to the Plaintiffs, for which Plaintiffs now sue..

## SEVENTH CLAIMS FOR RELIEF
### (Civil Conspiracy)

95.     Defendants are liable for aiding and abetting each other's breaches.

96.     Each of the Defendants owed and breached Plaintiffs fiduciary and other duties to the Plaintiff.

97.     The other Defendants knowingly participated and substantially assisted in those breaches, which caused damages to the Plaintiffs, for which Plaintiffs now sue.

## EIGHTH CLAIMS FOR RELIEF
### (Civil Conspiracy)

98.     The Individual Defendants reached an agreement to usurp and convert the Firehouse, Rino, and Isabelle Property opportunities by taking nominal title to the entities and/or properties and refusing to recognize the Promises and/or the advances by Plaintiffs, and took

several unlawful acts to accomplish that goal and./or several lawful acts to accomplish the unlawful objective of taking the opportunities, and caused Plaintiffs to suffer damages as a result.

99.     The Individual Defendants are therefore liable to Plaintiffs for civil conspiracy.

**NINTH CLAIMS FOR RELIEF**
**(Conversion/Theft)**

100.    The Defendants improperly committed distinct, unauthorized acts of dominion or ownership over  the equity in the Firehouse Defendants, Rino, and Isabelle Property as against the Plaintiffs, which deprived the Plaintiffs of their lawful rights and uses of the equity  and property and caused Plaintiffs to suffer damages.

101.    The Defendants are therefore liable to Plaintiffs for common law conversion and/or  civil theft under C.R.S. §18-4-405.

102.    The Defendants are therefore liable to Plaintiffs for actual damages, three times actual damages, and attorney's fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for the following relief:

(a)     Declaratory relief as prayed for above;

(b)     An award of title to the equity interests in Det-CO, the Firehosue Defendants, defendant Rino, and/or the Isabella property;

(c)     An accounting by Defendants and disgorgement of profits by Defendants;

(d)     Compensatory damages, and any other damages or other sums to be proven at trial or in subsequent proceedings, against each Defendant;

(e)     Restitution;

(f)     Treble damages;

(g)     Exemplary or punitive damages;

(h)      Pre-judgment and post-judgment interest, as supported by the evidence;

(i)      Ancillary equitable relief sought by motion or otherwise, including without limitation issuance of a temporary restraining order, preliminary injunction, permanent injunction, attachment, constructive trust, disgorgement, and/or turnover; and

(j)      One or more orders and a final judgment awarding Plaintiffs such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs respectfully demand trial by jury on all issues for which a jury trial is available.


Respectfully submitted this 10th day of July, 2017.

/s/ Francis B Majorie
**Francis B. Majorie**
The Majorie Firm Ltd.
4901 LBJ Freeway, Fourth Floor
Dallas, Texas 75244
Telephone: 214-306-8107
Email: fbmajorie@themajoriefirm.com

ATTORNEY FOR PLAINTIFFS
MELIH TAN AND PAMELA TAN