IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-1678

MELIH TAN and PAMELA TAN,
        Plaintiffs,

v.

DET-CO, INC., RINO SUPPLY CO, INC.,
GARY WEST, JARED PENMAN,
FIREHOUSE ORGANICS CENTRAL, LLC,
FIREHOUSE ORGANICS NORTH, LLC,
AND FIREHOUSE ORGANICS SOUTH, LLC,
        Defendants.
_____/

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS AND RESPONSE TO DEFENDANTS' ALTERNATIVE
MOTION FOR A MORE DEFINITE STATEMENT [D.E.27]**

Plaintiffs Melih Tan and Pamela Tan (the "Tans") file this response to the Motion To

Dismiss Or, Alternatively, For A More Definite Statement [D.E. 27] (the "MTD") filed by

Defendants as follows:

**I.  PRELIMINARY STATEMENT**

This is an action for damages and other relief arising out of the Defendants' usurpation of

two business transactions created through Plaintiffs' advances of over $1.35 million. The

Complaint pleads detailed facts showing that the two opportunities were created and developed in

substantial part through the use of Plaintiffs' money and that Defendants took title for their sole

and exclusive benefit only after orally agreeing that investors like the Tans would receive 80

percent of the value of the businesses and assets for the money they advanced and defendants Gary

West and Jared Penman would receive 20 percent (what is referred to as the "80/20 Split").

Before we turn to the arguments made in the MTD, it is important to address Defendants'

refrain that the Complaint does not attach "a single exhibit" and their assertion that the "suggestion

that one or more alleged sizeable transactions *could not be corroborated by a single document* defies belief and the legal requirements to maintain a lawsuit." (MTD at 1 & 2)(italics added) There is, of course, no legal requirement for a complaint to attach any exhibits. The Defendants also could have—but choose not to—provide the Court with copies of the numerous documents referred to in the Complaint. That is not surprising. The Defendants' argument about the lack of exhibits is thoroughly defeated by a document *which is expressly referred to in paragraph 32 of the Complaint and wholly ignored by the MTD*. The Complaint expressly alleges that, in August 2013, the Tans wrote an email to defendant West telling him "how very thankful and appreciative we are for the incredible job you have done with the Isabelle Grow." They continued:

> We cannot fully realize all that has gone into achieving the results you have reaped. Simply juggling the money has been a full time task alone, and things could not have been accomplished without your tuning, tweaking, and shuffling all the moving financial pieces to the great puzzle of rolling that big old dinosaur of a greenhouse into the profit machine it has now become. No one else could have handled the control panel as you have done—expertly and without complaint. You have shown your patience, talent and wisdom in accomplishing a very difficult task, and produced truly staggering results. We are deeply grateful for your efforts.

West responded by acknowledging and praising the Tans' investment, stating: "**Thank you. The real thanks is what you, Pam, and Tom has [sic] done with guidance and supplying an endless amount of money. I know how hard that task is and was. It is called team work**." (Bold added) This one document alone strongly establishes that assets usurped by the Defendants were made available to the Defendants only as a result of Plaintiffs' money and agreement for the Defendants to be involved. The Defendants' refrain about the supposed lack of documents supporting Plaintiffs' claims should therefore be seen for what it really is: an effort to distract the Court from the well-plead allegations of the Complaint.

## II.      THE ALLEGATIONS IN THE COMPLAINT

Defendants assert that the Complaint "purports to allege that four *seemingly* distinct and isolated transactions are related and have a common thread and purpose sufficient to provide a foundation to this lawsuit." (MTD ¶6)(italics added) Defendants use the phrase "seemingly distinct and isolated" because they know that, if the events described in the Complaint are linked, the Defendants cannot avoid liability for usurping and taking exclusive control over the Firehouse Business and the Isabella/Rino projects. The Complaint shows the connections between the Plaintiffs' money and the Defendants' theft of the assets as follows:

### A.      The Firehouse Business

**1.      Plaintiffs' One Million Dollars Created The Opportunity To Buy The Firehouse Business.** The Complaint alleges that, in 2010, Plaintiffs contributed $1 million in escrow to induce the then-owner of the Firehouse Business—Kim Gaetano—to enter into a contract to sell fifty percent of the Firehouse Business for $1.25 million. (Comp. ¶18). The opportunity was initially introduced to the Tans by an entrepreneur and promoter named Thomas S. Waldron, Sr. ("Waldron Sr."). (Comp. ¶15) In 2011 and 2012, litigation ensued which confirmed in a trial that the Tans were the source of the funds placed in escrow under the purchase contract and that Gaetano had in fact used a substantial part of those funds to purchase real estate ultimately transferred to her wholly-owned entities, including Pro-Tek, LLC and Star-Tek Holdings, LLC ("Star-Tek"). (Comp. ¶¶22-24 & ¶39).

Defendants label the original agreement with Gataeno the "First Transaction" and claim it is "unclear why this transaction between non-parties is relevant." (MTD ¶7)  But the relevance of those facts is simple: Plaintiffs' one million dollar advance substantially created the right to buy

the Firehouse Business in the first place. Indeed, Defendants admit that the Defendants were "uninvolved" with the asset at this point in time. (*Id.*)

    **2.**    **The Det-CO Agreement To Purchase The Firehouse Business Directly Emanated From The Opportunity Created By The Tans' One Million Dollars.** Defendants assert that the "First Transaction concludes at this juncture" (what "juncture" they are referring to is unknown) and then identify the next series of events involving the Firehouse Business as the "Third Transaction." (MTD ¶¶8 & 10) But calling the next series of events the "Third Transaction" is a fiction intended to try and put a distance between the opportunity created by the Tans' million dollars and the Defendants' purchase of the assets to the ultimate exclusion of the Tans. By contrast, the Complaint details the continuous, direct link between the initial events giving rise to the right to force Gataeno to sell the Firehouse Business and the agreement under which Defendants ultimately purchased that business.

    First, the Complaint alleges that, by the end of 2013, the litigation involving the original agreement to buy half of the Firehouse Business from Gataeno spawned efforts to restructure the transaction to include the purchase and sale of 100 percent of the Firehouse Business (both real estate and non-real estate assets). (Comp. ¶34) The parties recognized that they would need to work with the Colorado Marijuana Enforcement Division ("MED") to obtain advance licensing approval for the transfer. (Comp. ¶34) Waldron [Sr.], the Tans, West, and Penman discussed these challenges and agreed that: (a) West and Penman should represent the purchaser in connection with seeking approval for the initial purchase of the Det-CO/Firehouse businesses; and (b) they should disclose to the MED that some investors would be seeking approval from the regulators after West and Penman were approved and the initial purchase had taken place. (Comp. ¶35)

The Complaint buttresses these allegations by explaining that West and Penman were chosen to take title to the Firehouse Business on behalf of the Tans and the other investors because, among other reasons: (a) they were both residents of Colorado and could meet the other requirements for obtaining the licenses; (b) they had already been working for many months with the Tans, Waldron Sr., and his son ("Waldron Jr.") on the Isabelle/Rino transaction under the 80/20 Split; and (c) they were therefore known to and trusted by Waldron and some of the investors, including the Tans. (Comp. ¶¶36 & 27-32) The Complaint defines the "80/20 Split" as an oral agreement reached by Waldron, the Tans, West, and Penman that investors would receive 80 percent of the value of the businesses and assets for the money they advanced and West and Penman would receive twenty percent for providing services to the ventures. (Comp. ¶7) The Complaint further alleges that West and Penman agreed with Waldron and Plaintiffs to undertake the approval process for the Firehouse Business transaction, to make the disclosures about the investors to the MED during that process, and then make equity in the business and other assets available to the investors along a similar 80/20 Split, once the closing occurred and guidance from the MED had been obtained. (Comp. ¶37)

Second, the Complaint details the connection between the opportunity to buy the Firehouse Business created by Plaintiffs' million dollars and the agreement under which the Defendants ultimately took title to those assets. On December 31, 2013, West formed Det-CO to act as the purchaser of the Firehouse Business. (Comp. ¶38).  In January 2014, Det-CO entered into a Stock and Membership Interests Purchase Agreement (the "January Purchase Agreement") to purchase one hundred percent of the operating business (the Firehouse entities) and the real estate (Star-Tek) for $2.1 million ($440,000 of which was to be earmarked to pay a judgment against Gaetano held by Thomas Murphy). (Comp. ¶39)

West signed the January Purchase Agreement as the President of Det-CO "**or assigns**." (Comp. ¶40)(bold added) Moreover, as anticipated by members of the venture, the January Agreement specifically addressed the need to obtain approvals from the MED and the DEL for a transfer of the Firehouse Defendants. (Comp. ¶40)  Section 1.6 of the January Purchase Agreement underscored that the agreement was "contingent upon governmental approval for the change of ownership of the Company, any financing associate therewith, and the Associated Key Medical Marijuana licenses." (Comp. ¶40)  Section 1.4 of the January Purchase Agreement in turn provided that Det-CO would be "required to make a full and accurate truthful and timely disclosure of all of the sources of financing of the Buyer and all of the principal parties involved in the purchase of Seller's property" to the MED. (Comp. ¶40)

Third, the January Purchase Agreement was amended after several months of discussions with the MED involving, among other things, detailed disclosures concerning the investors and the expectations of developing the Det-CO/Firehouse Business for them once the operation was purchased. (Comp. ¶41) The MED ultimately indicated that it would approve the transaction if Waldron Sr. and Waldron Jr. did not have any direct or indirect ownership or profits participation in any of the licensed business entities (*i.e.*, the Firehouse Defendants); the regulators did *not* prohibit the Tans from holding an interest in the regulated entities or their profits.   (Comp. ¶42)

Fourth, to address the regulators' requirements, on or about May 30, 2014, Gaetano and Det-CO entered into an amended agreement (the "Amended Purchase Agreement") to "separate out" the purchase and sale of the Firehouse Business from the purchase and sale of Gaetano's real estate entities. (Comp. ¶43) The Amended Purchase Agreement called for a closing within 72 hours of its approval by the MED. (Comp. ¶43) Penman and West also executed a buyer's affidavit dated July 8, 2014 on behalf of Det-CO and themselves as individuals stating, among other things,

that they would not allow Waldron Sr. or Waldron Jr. to own or profit from the Firehouse Defendants but saying *nothing* about precluding the Tans or the other investors from doing so. (Comp. ¶44) There is thus a continuous and direct link from the Tans' original advance of one million dollars to the agreement under which Det-CO would purchase the Firehouse Business.

       **3.**    **Det-CO Purchased The Firehouse Business And Then Cut The Tans Out.** The Complaint alleges that Det-CO purchased the Firehouse Business at a closing which commenced on July 11, 2014 and was completed several days thereafter. (Comp. ¶ 45) The Complaint further alleges that, because the original purchase and sale transaction was split into two tranches, Det-CO was able to purchase 100 percent of the Firehouse Business for an agreement to satisfy the Murphy Judgment through execution and delivery of a $535,077.50 promissory note from Det-CO to Murphy, payable at the rate of $10,000 per month. (Comp. ¶45)  Neither West nor Penman paid any money to purchase the Firehouse Business nor did they guaranty the payments to be made to Murphy. (Comp. ¶46) To paraphrase the Defendants' argument, it "defies belief" that the Defendants were able to unilaterally and independently from the Plaintiffs purchase an on-going business with no money down, for $535,077.50 payable at the meager rate of $10,000 per month, with no personal liability, from a seller who had already received one million from those Plaintiffs for the purpose of buying that business. Defendants' position becomes even more untenable in light of the fact that they are trying to sell the Firehouse Business for $3.25 million.  (Comp. ¶62)

**B.  Isabelle/Rino**

       The second transaction that forms the basis of the Complaint is Isabelle/Rino. Again, the Defendants' divide this singular series of events into two transactions—the so-called "Second Transaction" and "Fourth Transaction"—and feigned ignorance about what happened.  But defendant West's own "it takes teamwork" email referred to in the Complaint confirms that he was

receiving what he called "an endless amount of money" from the Tans.  (Comp. ¶32)  In this light, the facts giving rise to Plaintiffs' claims concerning Isabelle/Rino are simple and straightforward:

1.     **The Opportunity To Buy Isabelle/Rino Was Funded With $350,000 From The Tans.**  The Complaint alleges that, as the Gataeno litigation concerning the Firehouse Business was moving forward in 2011 and 2012, Waldron Sr. started working with defendant Penman to assist in the development and growth of Penman's own medical marijuana business, defendant Rino. (Comp. ¶25) Waldron found an old greenhouse facility (the "Isabelle Property") which could yield substantial value to the Rino operation as a "grow" facility if Waldron and Penman could obtain two things: money and the day-to-day presence of a trustworthy manager with construction experience to oversee the project, clean up the property, and install improvements. (Comp. ¶26) The need for money was met by obtaining funds from investors—like the Tans—in exchange for an eighty percent share of the combined Rino business and Isabella Property (with Penman to retain the other twenty percent) (the "80/20 Split"). (Comp. ¶27) The need for a day-to-day construction manager was met by inviting defendant West to Colorado to work with Penman at Rino and on the Isabelle property. West and Waldron Sr. had been close personal friends for over 25 years and Waldron Sr. trusted him implicitly. West readily agreed. (Comp. ¶28)

In April 2012, New Alternatives Consulting, LLC ("NAC")—an entity owned and controlled by Waldron Jr.—entered into a lease of the Isabelle Property to develop and then purchase the site. (Comp. ¶29) West received a fifty percent interest in NAC. (Comp. ¶30) Defendant West and Waldron Jr. also formed Deep Blue Enterprises, LLC ("Deep Blue") to further the efforts of the venture, with West and Waldron Jr. each holding fifty percent membership interests and serving as co-managers (meaning that both needed to agree to bind the entity). (Comp. ¶30)  Then, on May 21, 2012, Deep Blue entered into a contract to purchase the Isabella Property

for $1,650,000, with an $110,000 earnest money deposit due by October 1, 2012 and the balance by July 23, 2014. (Comp. ¶30)

In addition to rent under the lease and the earnest money deposit under the purchase contract, NAC and Deep Blue were responsible for paying all costs and expenses associated with the Isabelle Property, including taxes, once they had executed the lease and the purchase contract. (Comp. ¶31) NAC and Deep Blue obtained the funds to do so from loans or advances by investors, including the Tans. (Comp. ¶31) Relying on the promised 80/20 Split, the Tans "directly or indirectly through their family's entity, Evren Partners, LLC ["Evren"], advanced over $350,000 for those expenses and others relating to the Rino/Isabelle Property enterprise." (Comp. ¶31)

Paragraph 9 of the Defendants' MTD refers to the foregoing events—including the Tans' advances for the Isabelle/Rino project—as the "Second Transaction." Ignoring West's "teamwork/endless money" email, paragraph 9 of the MTD falsely asserts that "[t]here is not a single written agreement referenced or attached to the Complaint evidencing the Second Transaction . . . ." Similarly, ignoring West's email and the fact that he was and is a co-managing member of NAC and Deep Blue, paragraph 9 of the MTD asserts that "it is unclear who received the funds; but it may be" NAC and Deep Blue. Finally, ignoring the allegation that the Tans "directly or indirectly through their family's entity, Evren" advanced the $350,000+, paragraph 9 of the MTD incorrectly argues that "Evren (not the Plaintiffs) advanced that money."

**2.     After Using Their Money To Develop Isabelle, The Defendants Cut Plaintiffs Out.** Having shown through detailed allegations that the Plaintiffs advanced over $350,000 to solidify and sustain the opportunity to buy Isabelle for the parties' venture under the 80/20 Split, the Complaint alleges how and when the defendants breached their promise to undertake the Isabelle purchase and took title to that property to the exclusion of the Plaintiffs. The Complaint

alleges that the closing date for Deep Blue to pay the balance of the purchase price for the Isabelle property was July 23, 2014 (or two weeks or so after Det-CO closed). (Comp. ¶49)  Deep Blue was prepared to make the payment with up to $2 million in lender commitments from seven individuals and entities. (Comp. ¶49)  Despite the funds to close—and the demands of Waldron Jr. that Deep Blue go forward with the closing—West suddenly refused to do so.  (Comp. ¶49)

Paragraph 13 of the MTD calls the forgoing events—and the Defendants' subsequent purchase of the Isabelle property for their own account to the exclusion of the Plaintiffs—the "Fourth Transaction." Paragraph 12 feigns ignorance as to why that contract did not close as scheduled, but the Complaint squarely alleges that defendant West refused to close and that "the Individual Defendants had caused an entity owned or controlled by Penman (Isabelle I, LLC) to enter into a 'back-up' contract in the event Deep Blue did not close as scheduled." (Comp. ¶50) The Complaint then details how Defendants took title to the Isabelle property for themselves after West prevented Deep Blue from taking title on behalf of the Plaintiffs and others under the 80/20 Split.[1] Thus, defendant West's wrongful refusal to close on the original Isabelle Property contract allowed that property to be stripped away from the Tans and other investors and provided defendant Rino and the Individual Defendants with a multi-million dollar windfall to the detriment of the Plaintiffs.  (Comp. ¶54)

---

[1] The Complaint alleges that: (1) Isabelle I, LLC assigned its right to purchase the Isabelle Property to TCG Assets, Inc. in exchange for TCG Assets' agreement to buy the property and then lease it to defendant Rino, an entity also controlled by Penman, with an option to purchase the property at the end of the lease term (Comp. ¶51); (2) on August 12, 2014, TCG Assets and Rino executed a two-year lease of the Isabelle Property with an option to purchase the property for $1,900,000 during the lease term  (Comp. ¶52); and (3) Rino exercised that option to purchase in August 2016 and is now the owner of the Isabelle Property.  (Comp. ¶53)

## III.     THE COMPLAINT SHOULD NOT BE DISMISSED UNDER FRCP 12(b)(6)

The first ground of the MTD is brought under FRCP 12(b)(6)(failure to state a claim upon which may be granted). When deciding the MTD, the court must focus on the allegations in the complaint—not on the Defendants' description or interpretation of it. The court must presume that all of Plaintiff's factual allegations are true and construe them in a light most favorable to plaintiff. Even if the Court believes that recovery is "remote and unlikely," all that is required is the pleading of sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" of wrongdoing. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). A claim has facial plausibility when plaintiff pleads factual content that allows the court to draw the "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).  None of Defendants' arguments warrants dismissal under these standards.

### A. Plaintiffs' Claims Are Not Barred By Public Policy

Paragraph 18 of Defendants' MTD asserts that Plaintiffs' claims should be dismissed because granting Plaintiffs relief would violate federal marijuana laws and the claims are therefore void for illegality. Defendants cite a 2012 Colorado state district court case for the conclusion that contracts for the sale of marijuana are void as against public policy. *Haeberle v. Lowden*, 2012 WL 7149098, *2 (Colo. 2012).  Because Plaintiffs have not plead that the contracts in this case concerned the actual purchase or sale of marijuana, *Haeberle* is inapposite. Moreover, several decisions rendered after *Haeberle*—including a 2016 opinion by Chief Judge Krieger of this Court—have rejected a broad-based public policy preclusion of claims in the licensed marijuana industry. *See, e.g.*, *Green Earth Wellness Ctr., LLC v. Atain Specialty Ins. Co.*, 163 F. Supp. 3d 821, 832-33 (D. Colo. 2016); *Mann v. Gullickson*, 2016 WL 6473215, *7 (N.D. Cal. 2016); *Green*

*Cross Medical, Inc. v. Gally*, 2017 WL 1382019 (Ariz. App. 2017).  Thus, this prong of the motion should be denied.

**B.      Plaintiffs Plead Viable Breach of Contract Claims**

Paragraphs 19 through 23 of the MTD assert that Plaintiffs' breach of contract claims should be dismissed. The first argument advanced by the Defendants is that the Complaint fails to allege the existence of an agreement.  But, as shown in detail in Section II above, the gravamen of Plaintiffs' claims is that they entrusted defendants West and Penman to spearhead the Firehouse Business and Isabelle/Rino projects for the benefit of the Plaintiffs under the oral 80/20 Split agreement. Plaintiffs assert that a contract was formed when the parties reached their oral agreements to move forward under the 80/20 Splits and/or when the Individual Defendants voluntarily undertook the projects with knowledge that Plaintiffs offered to allow them to do so based on the 80/20 Splits.  Colorado recognizes the existence of a contract based on either verbal offer and acceptance or acceptance of an offer implied from the conduct of the parties. *See Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008); *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 888 (Colo. 1986) (en banc); *Fair v. Red Lion Inn*, 920 P.2d 820, 825 (Colo. App. 1995).

The second argument advanced by the MTD is that the agreement between the parties concerning Isabelle/Rino "runs afoul" of the statute of frauds. (MTD ¶ 21)  But Colorado cases hold that parties who orally agree to jointly pursue property or other assets hold title to such property or assets in trust for the other despite the statute of frauds. *See Kincaid v. Miller*, 272 P.2d 276, 281 (1954); Austin *v. Stephen*, 354 P.2d 505, 510 (1960).

Defendants' third argument is that the breach of contract claim concerning the Firehouse transaction is barred by Colorado's three year limitation for contract claims.  (MTD ¶ 22)  But an

action for breach of contract "shall be considered to accrue on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence." C.R.S. § 13-80-108(6). The Complaint alleges that the "closing of Det-CO's purchase of the Firehouse Defendants commenced on July 11, 2014 and was completed several days thereafter" (Comp. ¶ 45) and that "West assured Plaintiffs on several occasions through 2015 that West and Penman acted the way they did to protect the Tans and the other investors and that the Defendants would make sure the investors received their equity interests or a return of their money, with interest" (Comp. ¶56). The foregoing facts defeat Defendants' statute of limitations argument. The Complaint was filed on July 10, 2017—one day before three years from the date the Firehouse closing started and several days before three years when the closing was completed. Moreover, the Complaint alleges that West assured the Plaintiffs that the Defendants would abide by their promise to restructure or repay as late as 2015. The Plaintiffs therefore did not discover and could not have discovered that the Defendants actually intended to breach their promises until 2015 (which would put the last day in the three year limitations period in 2018).

## C.    Plaintiffs' Good Faith And Fair Dealing Claims Should Not Be Dismissed

Paragraph 24 of the MTD asserts that Plaintiffs' claims for breach of the duty of good faith and fair dealing must be dismissed because such duties only arise out of a contract and the Plaintiffs have not shown the existence of a contract. Defendants' premise is correct, but their conclusion is not. As shown in Section III B above, Plaintiffs do show the existence of an enforceable contract against the Defendants. Thus, this prong of their MTD must be denied.

## D.   Plaintiffs' Promissory Estoppel Claims Should Not Be Dismissed

Paragraph 25 of the MTD asserts that Plaintiffs' promissory estoppel claims "cannot survive because Plaintiffs failed to identify a single agreement or promise by Defendants upon

which they 'reasonably' relied to their detriment."  Again, this argument ignores the well-plead allegations in the Complaint set forth in Section III above showing that the Individual Defendants made oral promises to Plaintiffs that the Defendants would pursue the two transactions for the benefit of the members of the venture under the 80/20 Split. It was reasonable to rely on those promises because the parties had—in the words of defendant West—been working cooperatively as a "team." Defendants' next argument—that Evren, and not the Plaintiffs, contributed the $350,000—is also belied by the allegations of the Complaint (and, once again, the West email) that the Tans provided the money directly or indirectly through Evren, their family business.  This prong of the motion should therefore be denied.

### E.  Plaintiffs' Fiduciary Duty Claims Should Not Be Dismissed

Paragraph 26 of the MTD asserts that Plaintiffs' fiduciary duty claims because "there was no fiduciary relationship between them."  But the Complaint alleges that the Defendants owed fiduciary duties to the Plaintiffs due to, among other things, an agency or joint venture relationship arising out of their agreement to jointly pursue the two transactions and/or the trust and confidence the Individual Defendants induced Plaintiffs to place in the Defendants and the Plaintiffs did in fact justifiably place in them.  (Comp. ¶¶ 55 & 89)  "Agency 'is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Mullin v. Hyatt Residential Grp., Inc.*, 82 F.Supp. 3d 1248, 1258 (D. Colo. 2015) (quoting *Stortroen v. Beneficial Fin. Co. of Colorado*, 736 P.2d 391, 395 (Colo. 1987)). A fiduciary duty also exists in this case due to the parties' joint pursuit of the assets. *See Kincaid*, 272 P.2d at 281 ("A joint adventure cannot exclude his associates from an interest in the property by purchasing it for his individual account. . . ."); *Austin*, 354 P.2d at 510 ("where the title to property acquired in connection with a joint adventure

is in the name of one of the parties, he holds it in trust for his associates"). Finally, Plaintiffs can establish a fiduciary duty claim by showing: (1) that they were justified in reposing trust or confidence in the other party, or that the other party invited, accepted, or acquiesced in that trust; (2) that the other party assumed a primary duty to represent the plaintiffs' interest in a transaction; (3) that the nature and scope of the duty extended to the subject matter of the claim; and (4) that it was damaged by the trustee's breach of that duty. *See Equitex, Inc. v. Ungar,* 60 P.3d 746, 752 (Colo. Ct. App. 2002). The Complaint pleads facts supporting all three of these bases for establishing a fiduciary duty. [2]

Paragraph 27 of the MTD reiterates Defendants' argument that these claims are time-barred under Colorado's three year statute of limitations. Like the contract claims, the statute for limitations for breach of fiduciary duty only begins to run when the breach is discovered or should have been discovered by the exercise of reasonable diligence. CRS § 13-80-108(8), C.R.S. 2010. The same analysis for defeating the contract claim therefore defeats this prong of the MTD. *See* Section III B, *supra.*

### F.  Plaintiffs' Unjust Enrichment Claims Should Not Be Dismissed

Paragraphs 26 through 30 of the MTD assert that Plaintiffs' unjust enrichment claims. "In Colorado, the elements of unjust enrichment are: (1) at the expense of a plaintiff; (2) a defendant

---

[2] These conclusions are not changed by the two cases cited by Defendants. In *Walshe v. Zabors,* 178 F. Supp.3d 1071, 1083 (D. Colo. 2016), the court recited general principles of fiduciary duty after noting that Walshe was a director and therefore owed such a duty.  It bears noting that the court also awarded Walshe substantial sums based on oral agreements pursuant to the doctrines of contract implied from conduct, promissory estoppel, and unjust enrichment. Walshe therefore helps Plaintiffs, not Defendants, here.  Similarly, although the Court in *Devery Implement  Co. v. JJ Case Co.,* 944 F.2d 724, 730 (10th Cir. 1991) noted that parties can engage at length for mutual profit without subjecting themselves to heightened fiduciary duties, it also noted that it is when the parties show by their concerted action that they "willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiducial relationship arises." That is what the Complaint alleges in this case and that is why the fiduciary duty claims should not be dismissed.

received a benefit; (3) under circumstances making it unjust for the defendant to retain the benefit without paying for it." *Touchtone Grp., LLC v. Rink*, 913 F. Supp. 2d 1063, 1084 (D. Colo. 2012). Whether a party is entitled to recovery on a theory of unjust enrichment requires a trial court to "engage in a highly fact-intensive inquiry," *Dudding v. Norton Frickey & Associates*, 11 P.3d 441, 445 (Colo. 2000), and to "make extensive factual findings to determine whether a party has been unjustly enriched." *Lewis v. Lewis*, 189 P.3d 1134, 1140 (Colo.2008). A person is unjustly enriched when he benefits as a result of an unfair detriment to another. *Salzman v. Bachrach,* 996 P.2d 1263, 1265 (Colo.2000).

Defendants first assert that they did not receive a benefit from Plaintiff's payment. But the Complaint alleges in detail how Plaintiffs' one million dollars locked in Gataeno's obligation to sell the Firehouse Business and how that obligation which was eventually discharged through the 2014 sale to Det-CO. [30] Defendants also assert again that "it was non-party Evren" who advanced the $350,000 for the Isabelle/Rino project, not the Plaintiffs. But as noted above, this is a factual argument which is contradicted by the allegations in the Complaint—and the West email—that the Tans were responsible for directing the $350,000 to that project either directly or indirectly through Evren. [4] The Court should therefore deny this prong of the MTD.

---

[3]Defendants' citation to *Johnson v. Am. Honda Motor Co.*, 2016 U.S. Dist. LEXIS 76121, 2016 WL 3078995, *5 (D. Colo. 2016) does not change this conclusion. In that case, the Plaintiff alleged that he "voluntarily sent his design to Honda, and Honda sent him a rejection letter" and therefore did not set forth any facts to evidence "mutual intention to enter into a contract." Here, by contrast, the Complaint showed in detail the events leading up to the two agreements to pursue the assets under the 80/20 Split.

[4] Defendants cite *In re Calderon*, 501 B.R. 726, 735 (D. Colo. 2103) for the proposition that LLCs have separate legal identities from their owners. That statement is true, but it misses the point. The essence of the allegations of the Complaint about the $350,000 is that the Plaintiffs made some of those payments directly and caused some of the payments they promised to make to be made on their behalf by Evren. Certainly, the West email confirms that the Defendants treated both types of payments as being made by the Tans as a matter of fact.

**G. Plaintiffs' Aiding And Abetting Claims Should Not Be Dismissed**

Paragraph 31 of the MTD asserts that Plaintiffs' claims for aiding and abetting breach of fiduciary duty should be dismissed because Plaintiffs have not shown the existence of a contract. As shown in Section III E above, Plaintiffs do allege facts showing a breach of fiduciary duty. Defendants also assert that Plaintiffs do not provide sufficient facts indicating a knowing participation in those breaches. FRCP 9(b) specifically provides that "intent, knowledge, and other conditions of a person's mind may be alleged generally." The MTD admits that paragraph 94 of the Complaint makes such an allegation. Thus, this prong of the motion must be denied. [5]

**H. Plaintiffs' Civil Conspiracy Claims Should Not Be Dismissed**

Paragraph 32 of the MTD asserts that Plaintiffs' conspiracy claims should be dismissed for several reasons. Defendants assert that the Complaint fails to allege the "when, what, how, or why of the conspiracy and its scope." But the Complaint does allege that the Individual Defendants reached an agreement to usurp and convert the Firehouse, Rino, and Isabelle property opportunities by taking nominal title to the entities or properties and refusing to recognize the promises they made to the Plaintiffs and/or the advances made by the Plaintiffs. The Complaint sets out in detail how that wrongful result was accomplished. Specific details about when the Individual Defendants decided to engage in that conduct is necessarily reliant on discovery. The court should not consider dismissing the conspiracy claims until such discovery is undertaken. [6]

---

[5] Defendants' citation to *Franco v. Nealy*, 20915 WL 4467436, *1 (D. Colo. 2015) is unavailing. That case was not decided on a MTD at the pleading stage, but was rather decided on summary judgment after discovery. It is therefore inapposite to the issue raised by the MTD.

[6] Defendants' citation to *Christou v. Beatport*, LLC, 2013 WL 248058, *12 (D. Colo. 2013) is unavailing. That case was not decided on a MTD at the pleading stage, but was rather decided on summary judgment after discovery. It is therefore inapposite to the issue raised by the MTD.

## I.   Plaintiffs' Conversion/Civil Theft Claims Should Not Be Dismissed

Paragraph 33 of the MTD asserts that Plaintiffs' claims for conversion and civil theft should be dismissed because neither the Firehouse Business nor the Isabelle/Rino project "belonged to" Plaintiffs at the time of the alleged conversion. Plaintiffs allege that the Defendants usurped the opportunities and then converted the assets which were the subject of the opportunities by excluding Plaintiffs from participating in them. Defendants' second argument—that the claims are barred by the three year statute of limitations—is defective for the same  timing of the accrual reasons offered in response to their arguments about the breach of contract and fiduciary duty claims.  Thus, this prong of the motion must be denied.

## J.   Plaintiffs' Declaratory Judgment Claims Should Not Be Dismissed

Paragraph 37 of the MTD asserts that Plaintiffs' declaratory judgment claims should be dismissed because the substantive claims upon which the declarations would be based are not viable. This argument is unavailing because the other claims should not be dismissed for the reasons set forth above.

## IV. ALTERNATIVELY, THE COURT CAN DIRECT FRCP 12(e) SUPPLEMENTATION

The second ground of the MTD is brought alternatively under FRCP 12(e)(more definite statement). Plaintiffs do not believe that their Complaint is deficient, for the reasons set forth in Section III *supra*. However, if the Court determines that the Complaint contains defects that would lead to dismissal if not corrected, Plaintiffs hereby consent to entry of such an order identifying those defects so that Plaintiffs may correct them and avoid dismissal.[7]

---

[7]Plaintiffs note in this connection that no scheduling order is yet in place. An amendment would therefore be made well before any deadline, and leave to amend should be freely granted "when justice so requires." *See* FRCP 15(a); *see also Fernandez v. Bridgestone/Firestone, Inc.*, 105 F. Supp.2d 1194, 1195 (D. Colo. 2000) (applying Rule15 when the deadline set for amendment in

## V. THE COMPLAINT DID NOT FAIL TO JOIN INDISPENSABLE PARTES

Paragraphs 38 through 44 of the MTD assert that the Complaint should be dismissed under FRCP 12(b)(7) and FRCP 19 for failing to join alleged Waldron Sr., Waldron Jr., Gataeno, Star-Tek, Evren. NAC, and Deep Blue as "Indispensable Parties." To obtain this relief, Defendants must meet the requirements of both FRCP 19(a) and FRCP 19(b) but fail to do so.

FRCP 19(a)(1) provides that a person must be joined as a party if complete relief cannot be accorded without them or the person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may as a practical matter impair or impede the person's ability to protect the interest or leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest. The MTD fails to establish any "Indispensable Person" as a necessary party.

First, the MTD asserts that the Indispensable Parties "are the actual breaching parties and/or tortfeasors" and "if judgment were somehow entered against Defendants, these Indispensable Parties would not share in the liability, as they rightfully should.  (MTD ¶ 41) But a "long line of precedent holds that joint tortfeasors are not indispensable under Rule 19—a plaintiff may generally choose whether to sue all joint tortfeasors collectively or pursue claims against any one of them." *Yates v. Portofino Equity & Mgmt. Co., LLC*, 2009 WL 416441 (D. Col. 2009).

Second, paragraph 41 of the MTD asserts that the so-called Indispensable Parties "*may claim an interest* in the Firehouse Defendants, Star-Tek, or the Isabelle Property, or in the proceeds of the sale of these entities and property, which will be affected if the Court finds that they were guilty of some wrongdoing." But FRCP 19(a)(1) requires the movants to prove that the alleged

---

the Scheduling Order has not yet passed).  Indeed, Defendants would be hard-pressed to object to this procedure since they filed a motion seeking such relief as part of their MTD.

"Indispensable Party" *actually* claims an interest. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Intrawest ULC*, 2014 WL 1016072, at *2 (D. Colo. Mar. 14, 2014) (internal quotation omitted)(ruling that a Rule 12(b)(7) motion "will not be granted on the vague possibility that persons who are not parties may have an interest in the action.").

Third, the party seeking dismissal under FRCP 12(b)(7) and 19 "has the burden of producing evidence showing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence." *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 17 F.3d 1292, 1293 (10th Cir.1994). The Defendants make no effort whatsoever to identify the interest possessed by each alleged "Indispensable Persons" or to explain why protection of those interests will be impaired unless they are joined in this case. *See Francis Oil & Gas, Inc. v. Exxon Corp.*, 661 F.2d 873, 879 (10th Cir. 1981).

Fourth, paragraph 41 asserts "the Court will have to make findings of fact and reach conclusions that will affect these parties without giving *them* the benefit of defending themselves." (Italics added)  But Rule 19 does not require joinder merely because a case calls for interpretation of an agreement to which a non-party is a signatory or they are not included in a lawsuit that may also involve their conduct. *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 464-465 (D.C. Cir. 2017) (the non-party's right to due process is protected because it cannot be "bound by any judgment rendered in its absence"). This conclusion is supported by CRS 13-21-111.5(3) (a), which provides "the finder of fact in a civil action may consider the degree or percentage of negligence or fault of a person not a party to the action" but any such "finding of a degree or percentage of fault or negligence of a nonparty shall not constitute a presumptive or conclusive finding as to such nonparty for the purposes of a prior or subsequent action involving that nonparty."

Finally, Defendants do not offer any evidence about the citizenship of the "Indispensable Parties" (a deficiency acknowledged at paragraph 42 of their MTD). The Defendants' MTD under FRCP 12(b) (7) and 19 should therefore be denied.

If the Court determines that Defendants have met their burden under FRCP 19(a) (1) (and they have not), it must then determine "whether in equity and good conscience the action should proceed among the parties already before it, or should be dismissed." Notes of Advisory Committee on Rules—1966 Amendment. Rule 19(b) sets out four factors to be considered in making that determination, which are fact-specific and are to be applied in a practical, pragmatic and equitable manner. *Francis Oil*, 661 F.2d at 878. The Defendants' arguments at paragraph 43 of their MTD simply rehash the unavailing arguments they made under FRCP 19(a) and make no effort to meet the requirements of Rule 19(b).

Finally, paragraph 45 of the MTD asserts that Plaintiffs have an adequate remedy if the action is dismissed for nonjoinder "because the Plaintiffs may re-file the action in state court." This argument ignores Defendants' assertion that Plaintiffs' claims are barred by the three year statute of limitations. Colorado law does not allow for a general tolling of a statute of limitations during the pendency of a prior action. *King v. W.R. Hall Transportation & Storage Co.*, 641 P.2d 916, 921 (Colo. 1982). However, CRS 13-80-111(1) provides: "If an action is commenced within the period allowed by this article and is terminated because of lack of jurisdiction or improper venue, the plaintiff . . . may commence a new action upon the same cause of action within ninety days after the termination of the original action."   Based on the foregoing, if this Court determines that it must dismiss the action for failing to join a non-diverse indispensable person or entity, Plaintiffs request that the Court expressly declare in its dismissal order that the action is dismissed without prejudice for lack of jurisdiction. Such a finding will allow Plaintiffs to file a follow-on

action in state court within ninety days thereafter and avoid any arguments that the limitations period expired while this case was pending. *See Sharp Bros. Contracting Co. v. Westvaco Corp.*, 817 P.2d 547, 552 (Colo. App. 1991) (action was timely because it was filed within ninety days after original federal court action was dismissed for lack of subject matter jurisdiction).

## VI.    CONCLUSION

For the foregoing reasons, the Court should: (a) deny the MTD under FRCP 12(b)(6) or, alternatively, grant Plaintiffs leave to replead under FRCP 12(e); (b) deny the MTD under FRCP 12(b)(7) and 19; and (c) grant Plaintiffs such other relief to which they prove entitled.

Dated: September 28, 2017

Respectfully submitted,

/s/ Francis B. Majorie_____
   Francis B. Majorie
   Texas Bar No. 12851420
   The Majorie Firm, Ltd.
   1450 Cottonwood Valley Court
   Irving,  TX 75038
   Tel. (214) 306-8107 (dd)
   Fax. (214) 522-7911
   Email: fbmajorie@themajoriefirm.com
   *Attorneys for Plaintiffs Melih Tan and*
   *Pamela Tan*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFIY that a true and correct copy of the foregoing has been furnished by CM/ECF this 28th day of September, 2017 to all those eligible to receive service through the CM/ECF system.

/s/ Francis B. Majorie_____
   Francis B. Majorie