# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-01678-NYW

MELIH TAN and PAMELA TAN,

       Plaintiffs,

v.

DET-CO, INC.,
RINO SUPPLY CO, INC.,
GARY WEST,
JARED PENMAN,
FIREHOUSE ORGANICS CENTRAL, LLC,
FIREHOUSE ORGANICS NORTH, LLC, and
FIREHOUSE ORGANICS SOUTH, LLC,

       Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on Defendants' "Motion to Dismiss Or, Alternatively, For a More Definite Statement and Incorporated Memorandum of Law" ("Motion to Dismiss"). [#27, filed August 18, 2017]. The Motion to Dismiss is before the undersigned Magistrate Judge pursuant to the 28 U.S.C. § 636(c) and the Orders of Reference dated September 1, 2017 [#31] and October 12, 2017 [#54]. After carefully reviewing the Motion to Dismiss and related briefing, the entire case file, and the applicable case law, the court **GRANTS** the Motion to Dismiss.

## FACTUAL BACKGROUND

Plaintiffs Melih Tan and Pamela Tan (collectively, "Plaintiffs" or "the Tans") initiated this civil action on July 10, 2017, to assert various state law claims arising out of a business agreement providing for the purchase and sale of a fifty percent equity interest in and management control of a collection of medical marijuana businesses and related assets located in Denver, Colorado (the "Original Purchase Agreement"). [#1 at ¶ 15]. The following allegations are derived from the Complaint, and are taken as true for the purposes of this Motion.

### The First Transaction: Firehouse Defendants

Mr. and Mrs. Tan allege that non-party Thomas Waldron, Sr. ("Mr. Waldron, Sr.") entered into the Original Purchase Agreement with non-party Kim Gataeno, and that they (the Tans) advanced $1 million "to create the opportunity to buy" the following Defendants, subject to the Original Purchase Agreement: Firehouse Organics Central, LLC; Firehouse Organic North, LLC; and Firehouse Organic South, LLC (collectively, "Firehouse Defendants"). The Tans placed the $1 million into escrow with Ms. Gataeno, whom the Tans allege "broke escrow to use over $725,000 of the purchase funds to buy real estate and placed title to the real estate in an entity outside the Firehouse entities which were the subject of the purchase agreement." [*Id.* at ¶ 20]. The Tans identify Star-Tek Holdings, LLC ("Star-Tek") as the entity that took title to the real estate purchased with the escrowed funds. [*Id.* at ¶ 39]. Plaintiffs also allege that Ms. Gataeno "purported to declare the contract 'null and void' due to, among other things, alleged

misrepresentations by Waldron to Gaetano and a failure to meet the licensing requirements of Colorado law at the time the contract was executed." [*Id.* at ¶ 21].[1]

The Second Transaction: the Isabelle Property

After the First Transaction failed, Mr. Waldron, Sr. began working with Defendant Jared Penman "to assist in the development and growth of his own [medical marijuana] business," named herein as Defendant Rino Supply Co., Inc. ("Rino"). [#1 at ¶ 25]. The Tans allege that Mr. Waldron, Sr. located a potential "grow" facility in Lafayette, Colorado (the "Isabelle Property") and obtained "funds from investors—like the Tans—in exchange for an eighty percent share of the combined Rino business and Isabella Property [sic]." [*Id.* at ¶ 27]. Defendant Penman retained the other twenty percent share, [*id.*], and engaged Defendant Gary West as the "day-to-day construction manager" to oversee the conversion of the Isabelle Property. [*Id.* at ¶ 28]. Mr. Waldron's son, Thomas Waldron, Jr., identified in the Complaint as "Tom Jr." (identified herein as "Mr. Waldron, Jr." or "Tom Jr."), entered into a lease of the Isabelle Property through his entity New Alternatives Consulting, LLC ("NAC"), "with an eye towards developing the site and then buying it." [*Id.* at ¶ 29]. Tom Jr. then collaborated with Defendant West to form Deep Blue Enterprises, LLC ("Deep Blue") "to further the efforts of the venture," and Tom Jr. gave Defendant West a fifty percent interest in NAC. On May 21, 2012, Deep Blue entered into a contract to purchase the Isabelle Property for $1,650,000; an $110,000 earnest money deposit was due by October 1, 2012, with the balance due by July 23, 2014.

---

[1] The Tans allege that a state court lawsuit followed, during which, "the Colorado District Court found that the Tans and others were the source of $1.1 million of the $1.25 million placed in escrow under the Original Purchase Agreement." [*Id.* at ¶ 23]. The Tans do not substantiate this allegation by attaching any orders or judgments from the state court.

In addition to paying rent under the lease and producing the earnest money deposit under the purchase contract, the Tans allege that NAC and Deep Blue "were responsible for paying all costs and expenses associated with the Isabelle Property, including taxes, once they had executed the lease and the purchase contract"; that "NAC and Deep Blue obtained the funds to do so from loans or advances by investors, including the Tans"; and that "the Tans directly or indirectly through their family's entity, Evren Partners, LLC, advanced over $350,000 for those expenses and others relating to the Rino/Isabelle Property enterprise." [*Id.* at ¶ 31].

<u>Purchase and Closing of the Firehouse Defendants</u>

On December 31, 2013, Defendant West formed Defendant Det-CO, Inc. ("Det-CO") under Colorado law "to act as the purchaser" of the Firehouse Defendants. [*Id.* at ¶ 38]. Approximately two weeks later, Ms. Gataeno and Det-CO entered into a Stock and Membership Interests Purchase Agreement (the "January Purchase Agreement"), which provided that Det-CO would purchase the stock and membership interests in the Firehouse Defendants, as well as Star-Tek, for $2.1 million. [*Id.* at ¶ 39]. Over $440,000 of the purchase price was to be set aside to satisfy a judgment held by Thomas Murphy against Ms. Gataeno (the "Murphy Judgment") which the Tans assert could have interfered with the purchase and sale. [*Id.*] The January Purchase Agreement specified that it was "contingent upon governmental approval for the change of ownership of the Company, any financing associate therewith [sic], and the Associated Key Medical Marijuana licenses," and required that Det-CO "make a full and accurate truthful and timely disclosure of all of the sources of [its] financing…and all of the principal parties involved in the purchase of [the] property" to the Colorado Marijuana Enforcement Division

("MED") and the Department of Excise and Licensing in the City of Denver (the "DEL"). [*Id.* at ¶ 40].

The Tans allege that, ultimately, the MED determined it would approve the purchase "as long as Waldron and Tom Jr. did not have any direct or indirect ownership or profits participation in any of the licensed MMJ business entities (i.e., the Firehouse Defendants)." [*Id.* at ¶ 42]. However, "the regulators did not prohibit the Tans or any of the other investors from holding an interest in the regulated entities or their profits"; "[n]or did the regulators prohibit Waldron or Tom Jr. from holding interests in real estate used by the Firehouse Defendants." [*Id.*]

To address these requirements, Ms. Gaetano and Det-CO entered into an amended agreement (the "Amended Purchase Agreement") to distinguish the purchase and sale of the Firehouse Defendants from the purchase and sale of the real estate entities (held by Star-Tek and another entity). [*Id.* at ¶ 43]. The closing of Det-CO's purchase of the Firehouse Defendants began on July 11, 2014. The Tans assert that, "[b]ecause the original purchase and sale transaction had been split into two tranches, the consideration provided for buying 100 percent of the MMJ business was an agreement to satisfy the Murphy Judgment," and that "consideration was met through execution of a $535,077.50 promissory note from Det-CO to Murphy, payable at the rate of $10,000 per month." [*Id.* at ¶ 45]. The Tans allege as follows:

> Neither West nor Penman paid any money to purchase the Firehouse Defendants business and they did not guaranty the payments to be made to Murphy. The Tans, on the other hand, had advanced over one million dollars to lock up the Original Purchase Agreement, which in turn made the Amended Purchase Agreement transaction possible.

[*Id.* at ¶ 46].

The Tans agreed to allow the Firehouse Defendants to be purchased by Det-CO with West and Penman as the original owners of that entity. The Tans reasonably believed West and Penman when they promised that they (and Det-CO) would restructure ownership in the entity to reflect the 80/20 Split agreed to by the parties once the purchase had closed and approvals for such a license transfer were obtained.

[*Id.* at ¶ 47].

If the Defendants had not made such a commitment, the Tans would have objected to the transaction and sued or otherwise taken actions to stop Det-CO (or West and Penman) from taking title.

[*Id.* at ¶ 48].

<u>Purchase and Closing of the Isabelle Property</u>

Deep Blue was scheduled to pay the balance of the purchase price for the Isabelle Property on July 23, 2014, approximately two weeks after Det-CO was scheduled to close on its purchase of the Firehouse Defendants. [#1 at ¶ 49]. The Tans allege that although Deep Blue had secured the balance "from seven individuals and entities," and Tom Jr. demanded that the closing occur as scheduled, Defendant West "suddenly refused to do so." [*Id.*] The Tans allege that Defendants Penman and West had engineered an alternative plan, as follows:

[they] caused an entity owned or controlled by Penman (Isabelle I, LLC) to enter into a "back-up" contract in the event Deep Blue did not close as scheduled. Isabelle I, LLC in turn assigned its right to purchase the Isabelle Property to TCG Assets, Inc. ("TCG Assets") in exchange for TCG Assets' agreement to buy the property and then lease it to defendant Rino, an entity also controlled by Penman, with an option to purchase the property at the end of the lease term (the "TCG Assignment Contract").

[*Id.* at ¶¶ 50, 51]. The Tans assert that, on August 12, 2014, as required by the TCG Assignment Contract, TCG Assets and Rino executed a two-year lease of the Isabelle Property with an option to purchase the property for $1,900,000 during the lease term; Rino exercised the option in August 2016 and is now the owner of the Isabelle Property. [*Id.* at ¶¶ 52, 53]. The Tans contend

that Defendant West's "wrongful refusal to close on the original Isabelle Property contract allowed that property to be stripped away from the Tans and other investors and provides defendants Rino and the Individual Defendants with a multi-million dollar windfall to the detriment of the Tans." [*Id.* at ¶ 54].

### Alleged Damages and Relief Sought

The Tans assert that Defendants owe them "fiduciary and other duties to treat them fairly, in good faith, with loyalty, and reasonable care and to undertake the purchase transactions for the benefit of the Tans and the other investors." [#1 at ¶ 55]. They allege that to date, $5,000 is all they have received from Defendants for their $1.3 million investment. [*Id.* at ¶ 58]. To that end, the Tans assert the following claims: for Declaratory Judgment; "Breach of Contracts/Duty of Good Faith And fair dealing"; Promissory Estoppel; Unjust Enrichment; Breach of Fiduciary Duty; Aiding and Abetting; Civil Conspiracy; and Conversion/Theft. *See* [#1]. They seek "the imposition of a constructive trust, and/or a transfer of ownership interests in Det-CO/Firehouse, Rino, and the Isabella Property [sic] among the Individual Defendants, the Plaintiffs, and others"; "an accounting and disgorgement of profits earned by DetCO/Firehouse, Rino, and for the Isabella Property [sic] during the applicable period"; "restitution under principles of unjust enrichment and/or damages to compensate Plaintiffs for the harms caused by the Defendants' breaches of duty and torts," in addition or in the alternative; and "punitive or exemplary damages in such amounts supported by the law and facts." [*Id.* at ¶¶ 64-67].

Mr. and Mrs. Tan are citizens of Florida, and assert that Defendants Penman and West are citizens of Colorado, Defendants Det-CO and Rino are Colorado corporations, and the

Firehouse Defendants are diverse limited liability companies.  *See* [#1 at ¶¶ 4-12].  The court thus exercises jurisdiction under 28 U.S.C. § 1332.

## PROCEDURAL HISTORY

Defendants, with the exception of Firehouse Organic South, LLC, filed the pending Motion to Dismiss on August 18, 2017.  *See* [#27].  They argue essentially that the Complaint fails to set forth a short and plain statement of the claims showing that Plaintiffs are entitled to relief, as required by Federal Rule of Civil Procedure 8(a).  They further argue that Plaintiffs fail to include seven indispensable parties, at least one of whom, Mr. Waldron, Jr., would destroy diversity jurisdiction.  For support, Defendants reference the verified complaint used to commence an action in Boulder County approximately two weeks after Plaintiffs initiated the present action, *Thomas S. Waldron Jr., et al. v. Gary West, et al.*, Case No. 2017-cv-30738 (Colo. Dist. Ct. Jul. 23, 2017) ("*Waldron v. West*").  [#27 at 3, n.2; #53-1].

Plaintiffs filed a Response to the Motion to Dismiss on September 28, 2017, [#40].  On October 5, 2017, the court converted the originally-planned Scheduling Conference into a Status Conference to discuss the briefing of the Motion to Dismiss, and reset the Scheduling Conference to occur on December 7, 2017.  *See* [#48].  Defendants thereafter filed a Reply. [#53].

On October 16, 2017, Defendants filed an unopposed motion to stay discovery and pretrial deadlines pending disposition of the Motion to Dismiss.  [#55].  The court granted the motion in part and stayed discovery, but denied the motion to the extent it sought to vacate the Scheduling Conference and rather reset it for March 20, 2018.  *See* [#56].  Plaintiffs thereafter filed a notice of voluntary dismissal with respect to Firehouse Organic South, LLC.  *See* [#58].

## STANDARDS OF REVIEW

### I.    Federal Rule of Civil Procedure 8(a)

Every complaint filed in federal court is subject to Rule 8(a) of the Federal Rules of Civil Procedure. Rule 8(a) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 8(a), an operative pleading need only give the opposing side fair notice of the basis of the claims; the Rule is not intended to facilitate consideration of the merits of a claim at that stage. *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 514 (2002). However, "a complaint must explain what each defendant did to him or her; when the defendant did it; how the defendant's actions harmed him or her; and, what specific legal right the plaintiff believes the defendant violated." *Nasious v. Two Unknown B.I.C.E. Agents*, 492 F.3d 1158, 1163 (10th Cir. 2007).

### II.    Fed. R. Civ. P. 12(b)(6)

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the court must "accept as true all well-pleaded factual allegations … and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). However, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009). Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted). "The burden is on the plaintiff to frame 'a complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief." *Id.* The ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

III.    **Fed. R. Civ. P. 19**

Rule 19 requires joinder of additional parties if the party to be joined is subject to service of process and joinder will not deprive the court of subject-matter jurisdiction, and if one of two conditions is met. Fed. R. Civ. P. 19(a)(1). The first consideration is whether, in the absence of the additional parties, complete relief could be accorded to the existing party. *See Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1258 (10th Cir. 2001). The second consideration is whether disposition of the action without the participation of the additional parties would impair, as a practical matter, the existing party's ability to protect his interests or subject him to inconsistent outcomes. Fed. R. Civ. P. 19(a)(1)(A)-(B). A party that is necessary under Rule 19(a) who can be joined should be joined. *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1288 (10th Cir. 2003). Under Rule 12(b)(7), a court may dismiss a complaint for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7).

## ANALYSIS

### I.      Defendants' Characterization of the Complaint

Defendants characterize Plaintiffs' Complaint as depicting four separate transactions involving no commonality other than Plaintiffs' "initial 'advance,' investment or loan to Kim Gataeno and Thomas Waldron Sr."  [#27 at 3].  Defendants argue that the lawsuit is premised on the allegation that the Tans gave $1 million to Ms. Gataeno, and Ms. Gataeno "appears to have spent [the money]," and the allegation that Evren "advanced" $350,000 to NAC and Deep Blue to be used toward the leasing and business expenses associated with the Isabelle Property. Defendants contend that these allegations (1) demonstrate that indispensable parties are missing from the action; and (2) are insufficient to state a claim for relief as to Defendants, let alone entitle the Tans to share in the ownership and profits of the Firehouse Defendants, Star-Tek, and the Isabelle Property.  *See* [*id.* at 6-7].  Defendants describe the four transactions as follows.

#### *First Transaction*

With respect to the First Transaction, Defendants argue that Plaintiffs allege only that they advanced $1 million to purchase a fifty percent equity interest in and management control of the Firehouse Defendants; Plaintiffs do not allege to whom they paid the money, and they admit that neither they nor any of the Defendants are parties to the Original Purchase Agreement, which was a written contract between Ms. Gataeno and Mr. Waldron, Sr.  Plaintiffs allege only that Ms. Gataeno's attorney received the $1 million to place into escrow, and that Ms. Gataeno "broke escrow" to use $750,000 of the funds "to buy some unidentified real property" in the name of Star-Tek.  [*Id.* at 3-4].  Ms. Gataeno then declared the Original Purchase Agreement null and void.

### *Second Transaction*

Defendants argue that, per the Complaint, Plaintiffs' family's entity, Evren Partners, LLC ("Evren"), not Plaintiffs as individuals, provided funds in excess of $350,000 to pay the rent and building expenses associated with the Isabelle Property. *See* [#27 at 4]. Specifically, Plaintiffs allege:

> In addition to rent under the lease and the earnest money deposit under the purchase contract, NAC and Deep Blue were responsible for paying all costs and expenses associated with the Isabelle Property, including taxes, once they had executed the lease and the purchase contract. NAC and Deep Blue obtained the funds to do so from loans or advances by investors, including the Tans. In fact, the Tans directly or indirectly through their family's entity, Evren Partners, LLC, advanced over $350,000 for those expenses and others relating to the Rino/Isabelle Property enterprise

[#1 at ¶ 31]. Defendants also argue that it is unclear from the Complaint who was involved in the transaction, and that "[t]here is not a single written agreement referenced or attached to the Complaint evidencing the Second Transaction, which purportedly involved Waldron Sr., Waldron Jr., NAC, Deep Blue." [*Id.*]

### *Third Transaction*

Defendants state that the Third Transaction was memorialized in the January Purchase Agreement as amended by the Amended Purchase Agreement. Defendants argue that Plaintiffs are not parties to the Amended Purchase Agreement and do not otherwise allege, and that they likewise do not allege that they contributed funds for Det-CO to purchase from Ms. Gataeno the stock and membership interest in the Firehouse Defendants. *See* [#1 at ¶¶ 39-40, 43, 45]. Rather, Plaintiffs allege only that they "had advanced over one million dollars to lock up the Original Purchase Agreement, which in turn made the Amended Purchase Agreement transaction possible." [*Id.* at ¶ 46]. Defendants contend that this Transaction purportedly involved Mr.

Waldron, Sr., Mr. Waldron, Jr., Ms. Gataeno, and Star-Tek, along with Defendants and another unrelated individual and entity. [#27 at 5].

### *Fourth Transaction*

Defendants describe the Fourth Transaction as the purchase of the Isabelle Property. Defendants assert that Plaintiffs do not allege if a written contract for sale existed for Deep Blue to purchase the Isabelle Property,[2] and do not allege that they provided the funds for Deep Blue to purchase the Isabelle Property. [#27 at 6]. Rather, Plaintiffs allege only that "Deep Blue was fully prepared to make the payment, having secured up to $2 million in lender commitments for the purchase of the property from seven individuals and entities." [#1 at ¶ 49]. Plaintiffs also allege that Isabelle I, LLC, owned and controlled by Defendant Penman, had entered into a contract to buy the Isabelle Property, and that it assigned its right to the property to TCG, who ultimately purchased the property and leased it to Rino, who then bought the property in August 2016. [*Id.* at ¶¶ 50-53]. Again, Defendants contend, Plaintiffs were not involved in the Fourth Transaction.

## II.    Pleading Deficiencies

### A.    Federal Rule of Civil Procedure 8

Defendants first suggest that the Complaint is deficient because it lacks "even a single exhibit." [#27 at 2]. This court respectfully disagrees that Plaintiffs' pleading fails solely because of the lack of exhibits. Indeed, it is well-settled that the assessment of a complaint under Rule 12(b)(6) is ordinarily limited to the four corners of the pleading. *American Casualty Co. v.*

---

[2] At paragraph 30, Plaintiffs allege that "Deep Blue entered into a contract to purchase the Isabella Property [sic] for $1,650,000, with an $110,000 earnest money deposit due by October 1, 2012 and the balance by July 23, 2014." [#1 at ¶ 30].

*Glaskin*, 805 F. Supp. 866, 869 (D. Colo. 1992); *Jenner v. Ortiz*, 155 P.3d 563, 564 (Colo. App. 2006) (citations omitted). Nevertheless, upon review of the Complaint, this court concludes that the pleading does not contain the necessary factual averments, taken as true, to demonstrate that the Tans are entitled to relief from the individuals and entities they have named, and, indeed, copies of the various agreements described in the Complaint might have bolstered Plaintiffs' contentions. *See infra*, n.5. While the allegations and contentions asserted in the Complaint indicate that the Tans invested a sizeable amount of money in a failed endeavor to grow and sell medical marijuana, the Complaint as it presently reads does not implicate the named Defendants in liability with respect to Plaintiffs under any of the proposed theories. In their Response to the Motion to Dismiss, Plaintiffs state emphatically that they have alleged the existence of both oral contracts and promises between themselves and Defendants West and Penman. I respectfully disagree. The Complaint may adequately allege that Defendants West and Penman received a windfall, but it does not allege that the windfall came at the Tans' expense. The court simply cannot discern from the Complaint the factual detail necessary to find that Plaintiffs have satisfied their pleading burden. Moreover, the Tans are in a position more than anyone else to provide in detail the underlying facts as to these alleged conversations and agreements. The court will not accept conclusions in lieu of factual allegations, and Plaintiffs cannot substitute the recitation of the elements of a cause of action for the factual rendition of the events giving rise to their grievance. *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555.

The court's review of the Complaint demonstrates as follows. With respect to the First Transaction, in October 2010, Mr. Waldron, Sr. entered into the Original Purchase Agreement with Ms. Gataeno to purchase 50 percent interest in the Firehouse Defendants. [#1 at ¶ 15]. The

purchase price was $1.25 million; the Tans advanced $1 million, and Mr. Waldron, Jr. and/or entities "he owned or controlled" advanced the balance. [*Id.* at ¶ 18]. The money was held in escrow, and Ms. Gataeno allegedly used $750,000 of the funds prior to the purchase closing. [*Id.* at ¶ 20]. Ms. Gataeno also declared the Original Purchase Agreement "'null and void' due to, among other things, alleged misrepresentations by [Mr. Waldron, Sr.] to Gaetano and a failure to meet the licensing requirements of Colorado law at the time the contract was executed." [*Id.* at ¶ 21]. Litigation in state court ensued, though the Tans do not identify who the parties were in that action and do not appear to have been parties to that action. *See* [*id.* at ¶¶ 22-23]. These factual allegations fail to implicate any of the currently named Defendants in any of Plaintiffs' claims, nor do Plaintiffs articulate any viable theory to proceed as third party beneficiaries.

With respect to the Second Transaction, Mr. Waldron, Sr. "started working with" Defendant Penman in the development of Defendant Rino, which led to Mr. Waldron, Sr.'s discovery of the Isabelle Property. [#1 at ¶¶ 25, 26]. The Tans arguably allege they invested in the Isabelle Property, although it is not entirely clear: "[t]he need for money [for the Isabelle Property] was met by obtaining funds from investors—like the Tans— in exchange for an eighty percent share of the combined Rino business and Isabella Property [sic]." [*Id.* at ¶ 27]. But the Tans do not allege the amount of money they invested, to whom they provided the money (Penman, Mr. Waldron, Sr., or someone else), or what the terms of the investment were, other than the Tans would gain 80 percent ownership in Rino and the Isabelle Property and Defendant Penman would retain 20 percent. *See* [*id.* at ¶¶ 27-28]. Then, in April 2012, Mr. Waldron, Jr. leased the Isabelle Property through his company, NAC, and formed Deep Blue with Defendant West. Deep Blue contracted to purchase the Isabelle Property. [*Id.* at ¶¶ 29-30]. NAC and Deep

Blue paid the lease on the Isabelle Property and provided the earnest money deposit under the purchase contract through "loans or advances by investors." [*Id.* at ¶ 31]. One of the investors was Evren, which advanced over $350,000 for expenses "relating to the Rino/Isabelle Property enterprise." [*Id.*] These factual allegations similarly fail to implicate Defendants for liability with respect to the Tans. At best, the allegations indicate that Evren invested in NAC and Deep Blue, but the Complaint is silent as to the terms of that investment or any associated agreement.[3]

The Third Transaction centers again around Mr. Waldron, Sr. and Ms. Gataeno, who together endeavored to restructure the sale and purchase of the Firehouse Defendants in 2013. [#1 at ¶ 34]. Plaintiffs allege that, to this end, Defendants West and Penman "agreed with Waldron and Plaintiffs to undertake the [regulatory] approval process for the transaction to make the disclosures about the investors to the MED and DEL during that process, and then make equity in the business and other assets available to the investors along a similar 80/20 Split, once the closing occurred and guidance from the MED and DEL had been obtained." [*Id.* at ¶ 37]. Defendant West formed Det-CO for the purpose of purchasing the Firehouse Defendants from Ms. Gataeno, and Ms. Gataeno and Det-CO entered into the January Purchase Agreement in early 2014. [*Id.* at ¶¶ 38, 39]. Under the January Purchase Agreement, Det-CO would purchase the Firehouse Defendants and Star-Tek in whole for $2.1 million; "[o]ver $440,000 of that purchase price was to be set aside to satisfy a judgment held by Thomas Murphy against

---

[3] Plaintiffs argue in their Response that "[t]he essence of the allegations of the Complaint about the $350,000 is that the Plaintiffs made some of those payments directly and caused some of the payments they promised to make to be made on their behalf by Evren. Certainly, the West email confirms that the Defendants treated both types of payments as being made by the Tans as a matter of fact." [#40 at 16 n.4]. The court respectfully finds that the Complaint speaks for itself. Plaintiffs do not allege a distinction in who provided what part of the $350,000, and the matter of Evren's capacity and standing to sue remains a problem, as discussed in more detail below.

Gataeno." [*Id.* at ¶ 39]. The MED thereafter "indicated" it would approve the transaction only if the Waldrons "did not have any direct or indirect ownership or profits participation" in the Firehouse Defendants. [#1 at ¶ 42]. Thus, in May 2014, Ms. Gataeno and Det-CO entered into the Amended Purchase Agreement to distinguish the sale of the Firehouse Defendants from the sale of Star-Tek. [*Id.* at ¶ 43]. Plaintiffs allege that, "[b]ecause the original purchase and sale transaction had been split into two tranches, the consideration provided for buying 100 percent of the MMJ business was an agreement to satisfy the Murphy Judgment. That consideration was met through execution of a $535,077.50 promissory note from Det-CO to Murphy, payable at the rate of $10,000 per month." [*Id.* at ¶ 45]. Plaintiffs also allege:

> Neither West nor Penman paid any money to purchase the Firehouse Defendants business and they did not guaranty the payments to be made to Murphy. The Tans, on the other hand, had advanced over one million dollars to lock up the Original Purchase Agreement, which in turn made the Amended Purchase Agreement transaction possible.

> The Tans agreed to allow the Firehouse Defendants to be purchased by Det-CO with West and Penman as the original owners of that entity. The Tans reasonably believed West and Penman when they promised that they (and Det-CO) would restructure ownership in the entity to reflect the 80/20 Split agreed to by the parties once the purchase had closed and approvals for such a license transfer were obtained.

> If the Defendants had not made such a commitment, the Tans would have objected to the transaction and sued or otherwise taken actions to stop Det-CO (or West and Penman) from taking title.

[*Id.* at ¶¶ 46-48].[4] These allegations similarly lack the factual precision and clarity necessary to notify both Defendants and the court as to who exactly Plaintiffs allege harmed them, how the

---

[4] In their Response, Plaintiffs repeat that Det-CO "was able to purchase 100 percent of the Firehouse Business for an agreement to satisfy the Murphy Judgment through execution and delivery of a $535,077.50 promissory note from Det-CO to Murphy, payable at the rate of $10,000 per month," and emphasize that "[n]either West nor Penman paid any money to

Defendant(s) harmed them, when the harmed occurred, what duty or obligation did Defendant(s) owe the Tans, and the specifics of the resulting damage. For instance, Plaintiffs provide no explanation as to how the $1 million they advanced during the failed First Transaction "made the Amended Purchase Agreement transaction possible." Nor do they explain the source of Defendant Penman's liability; Defendant West is the purported owner of Det-CO. The court also notes that Plaintiffs allege the January Purchase Agreement provided that Det-CO would be "required to make a full and accurate truthful and timely disclosure of all of the sources of financing of the Buyer and all of the principal parties involved in the purchase of Seller's property" to the MED and DEL, [*id.* at ¶ 40], and they do not allege that the Amended Purchase Agreement omitted this provision. Thus it would appear that documentation should exist regarding the Tans' precise investment as alleged with respect to the purchase of the Firehouse Defendants.[5]

Finally, with respect to the Fourth Transaction, the Tans allege Defendant West improperly thwarted the closing of Deep Blue's purchase of the Isabelle Property to allow Defendant Penman through Rino to purchase the property, to the Tans' detriment. Plaintiffs allege that Deep Blue, owned and controlled by Defendant West and Mr. Waldron, Jr., had

purchase the Firehouse Business nor did they guaranty the payments to be made to Murphy." [#40 at 7]. But Plaintiffs do not profess to be responsible themselves for providing the purchase money; rather, it is unclear from what source Det-CO secured those funds.

[5] Although documentation is not required, and often is not necessary, to state a claim for relief in an initial pleading, Plaintiffs might have benefitted from attaching supporting documentation to their pleading to establish the factual basis for their claims. *Cf. Snyder v. ACORD Corporation*, No. 1:14-cv-01736-JLK, 2016 WL 192270, at *2 (D. Colo. Jan. 15, 2016) (granting motion to dismiss under Rule 8 and noting that the plaintiffs, who asserted breach of contract claims, "nowhere attach[ed] or quote[d] their insurance contracts themselves, which are central to their claims against the Selling Defendants."). As it stands, the Complaint fails to factually allege from what source Det-CO secured those funds.

secured $2 million "in lender commitments…from seven individuals and entities" to purchase the Isabelle Property, when Defendant West refused to go forward with the closing. [#1 at ¶ 49]. Instead, Defendant West proceeded to close with Isabelle I, LLC, an entity Plaintiffs allege is owned and controlled by Defendant Penman. [*Id.* at ¶ 50]. Rino, also owned and controlled by Defendant Penman, ultimately purchased the Isabelle Property in August 2016. [*Id.* at ¶ 53].[6] The Tans allege that Defendant West's "wrongful refusal to close on the original Isabelle Property contract allowed that property to be stripped away from the Tans and other investors and provides defendants Rino and the Individual Defendants with a multi-million dollar windfall to the detriment of the Tans." [*Id.* at ¶ 54]. This is a conclusory statement and not a factual allegation because it lacks the requisite level of detail. The Tans do not allege that they invested in Deep Blue or that they contributed to the $2 million investment Deep Blue intended to use to purchase the Isabelle Property. The Tans provide no factual allegations to explain how they were involved in the purchase of the Isabelle Property, or what rights they would assert with respect to Deep Blue's purchase of that property. As explained above, the fact that they allege to have advanced $1 million towards the First Transaction is insufficient to explain their involvement in or entitlements with regard to the subsequent transactions. Accordingly, this court finds the factual predicates underlying the claims fail to satisfy a Rule 8(a) review. For the purpose of rendering a thorough decision and providing complete guidance, however, I address Defendants' arguments with respect to each claim.

---

[6] The court notes that the Complaint does not identify the original owner of the Isabelle Property, the individual or entity who presumably entered into the purchase agreement with Deep Blue.

**B.      Federal Rule of Civil Procedure 12(b)(6)[7]**

As an initial matter, I note that a federal court with diversity-based jurisdiction over a case, as here, applies the laws of the forum state in analyzing the underlying claims. *PayoutOne v. Coral Mortg. Bankers*, 602 F. Supp. 2d 1219, 1223–24 (D. Colo. 2009) (*citing Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Essex Ins. Co. v. Vincent*, 52 F.3d 894, 896 (10th Cir. 1995)).

1.      Breach of Contracts/Duty of Good Faith and Fair Dealing.

*Breach of Contract*.      To state a claim for breach of contract under Colorado law, a plaintiff must sufficiently plead the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *PayoutOne*, 602 F. Supp.

---

[7] Defendants' lead argument under Rule 12(b)(6) is "the alleged transactions at issue are void and unenforceable as against public policy," on account that contracts "dealing with the sale of medical marijuana are void and unenforceable as against public policy because they violate federal law." [#27 at 8]. In light of the court's findings contained herein and its ultimate grant of permission for leave to amend the pleading, the court declines to pass on this argument at this time. Defendants may renew the argument at a later date, if appropriate. However, should they choose do so, they are advised that the court would require a more robust briefing of the issue than what is present in the Motion to Dismiss. *See Green Earth Wellness Center, LLC v. Atain Specialty Insurance Co.*, 163 F. Supp. 3d 821, 835 (D. Colo. 2016) (declining insurance company defendant's invitation to declare insurance policy of coverage of medical marijuana grow business void on public policy grounds, noting that there has been "a continued erosion of any clear and consistent federal public policy in this area" and that the defendant "having entered into the Policy of its own will, knowingly and intelligently, is obligated to comply with its terms or pay damages for having breached it"). And the court takes judicial notice of the determination by the Colorado Court of Appeals that the First Transaction between Mr. Waldron, Sr. and Ms. Gataeno was not in furtherance of an illegal, unenforceable contract, which determination was rendered as part of the state court lawsuit that Plaintiffs reference in their Complaint. *Green-Visiontek, LLC v. Goodman*, No. 13CA1049, 2014 WL 4778255, at *8 (Colo. App. Sept. 25, 2014) (reversing trial court "because the statutory prohibitions on which it relied did not yet apply to the parties at the time these contracts were executed."). *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("federal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue").

2d at 1224 (citing *W. Distrib. Co. v. Diodosio,* 841 P.2d 1053, 1058 (Colo. 1992)). *See also Indus. Prods. Int'l, Inc. v. Emo Trans, Inc.,* 962 P.2d 983, 988 (Colo. App. 1997) (stating that an enforceable contract requires mutual assent to an exchange between competent parties regarding certain subject matter, for which there is legal consideration). The Tans do not identify a single contract to which they are parties, let alone describe the offer that was made to them or by them and accepted. Rather, following sixty-eight paragraphs of factual allegations, the Tans allege for the first time in the section titled "Claims for Relief" that they and Defendants "are parties to binding contracts under which the parties agreed (the "Promises") that":

> (a) the Individual Defendants and Plaintiffs would jointly pursue acquisition and development of the Firehouse Defendants, development of Rino, and acquisition and development of Isabella Property; (b) Plaintiffs would make advances of monies for those common goals; and (c) the Individual Defendants would receive a twenty percent interest and Plaintiffs and other investors would receive an eighty percent interest in the equity of defendant Det-CO (and/or the Firehouse Defendants), defendant Rino, and/or the Isabella Property [sic].

[#1 at ¶ 76]. I find that this allegation fails to provide sufficient detail to state a claim. First, there are no factual allegations in the Complaint regarding a written or oral contract to which the Tans were party. The only contracts referenced are between Mr. Waldron, Sr. and Ms. Gaetano (Original Purchase Agreement), Ms. Gaetano and Det-CO/Defendant West (January Purchase Agreement and Amended Purchase Agreement), and the contract Deep Blue entered into for the purchase of the Isabelle Property, [#1 at ¶ 30]. Second, there are no factual allegations in the Complaint detailing the terms or nature of the agreement that Plaintiffs allege existed between them and Defendants Penman and West. Indeed, the only monetary investment for which Plaintiffs claim personal responsibility is the $1 million provided in the First Transaction, and the Complaint demonstrates that neither Penman nor West was involved in that Transaction. *See*

[#1 at ¶¶ 15-24]. Accordingly, there are no factual allegations to support the Tans' contention that a mutual assent occurred between them and Defendants Penman and West to share equity in the Firehouse Defendants, Rino, and the Isabelle Property.

In their Response, Plaintiffs argue that "a contract was formed when the parties reached their oral agreements to move forward under the 80/20 Splits and/or when the Individual Defendants voluntarily undertook the projects with knowledge that Plaintiffs offered to allow them to do so based on the 80/20 Splits." [#40 at 12]. But the description of the "80/20 Split" as provided in the Complaint does not satisfy the legal standard of a contract. Plaintiffs allege that "[t]he need for money was met by obtaining funds from investors—like the Tans— in exchange for an eighty percent share of the combined Rino business and Isabella Property (with Penman to retain the other twenty percent)(the '80/20 Split')." [#1 at ¶ 27]. An enforceable contract requires not only mutual assent, but the articulation of certain subject matter, for which there is legal consideration. *Indus. Prods. Int'l, Inc.* 962 P.2d at 988. The "80/20 Split" does not identify all parties to the agreement nor does it describe the material terms of the agreement. For instance, how many investors were involved and what was the apportionment of interest among the investors; when and under what circumstances was the 80/20 Split agreed upon; did the oral agreement occur in person or over the telephone; were all investors aware of and did they consent to the 80/20 Split. Additionally, the Tans fail to describe the funds they exchanged for the property interest (the court has previously explained that the Tans cannot rely on the funds that Evren provided), and otherwise fail to articulate the legal consideration they provided as part of the 80/20 Split.

*Statute of Frauds*.  Additionally, as the matter relates to Evren, Defendants argue that to the extent Evren's contribution of funds in furtherance of the Second Transaction could be attributed to Plaintiffs individually, Colorado's Statute of Frauds bars Plaintiffs from asserting an agreement for conveyance of an interest in real property.  [#27 at 9].  In Colorado, contracts governing interests in land must be set forth in writing; specifically:

> Every contract for the leasing for a longer period than one year or for the sale of any lands or any interest in lands is void unless the contract or some note or memorandum thereof expressing the consideration is in writing and subscribed by the party by whom the lease or sale is to be made.

Colo. Rev. Stat. § 38-10-108.  Plaintiffs argue in their Response that parties who orally agree to jointly pursue property or other assets hold title to such property or assets in trust for the other despite the statute of frauds.  [#40 at 12 (citing *Kincaid v. Miller*, 272 P.2d 276, 281 (1954); *Austin v. Stephen*, 354 P.2d 505, 510 (1960))].  Indeed:

> if, because of the confidence engendered by one party, the other party fails to assure that an oral agreement respecting the title to real estate is reduced to writing, as required by the statute of frauds, the party making the oral promise cannot rely upon such statute in a suit seeking to enforce the oral promise. Rather, the promisor will be treated, in such case, as a constructive trustee for the other party.

*Jarnagin v. Busby, Inc.*, 867 P.2d 63, 67 (Colo. App. 1993) (citing *Page v. Clark,* 197 Colo. 306, 592 P.2d 792 (1979)).  The *Jarnagin* court described a confidential relationship between parties to a transaction as follows: "one party is impelled or induced to place his or her confidence in the other to such an extent that he or she relaxes the care and vigilance that should and would ordinarily have been exercised in dealing with a stranger."  *Id.* at 66 (citations omitted).  The court further specified that a party establishes a breach of a fiduciary duty arising from a confidential relationship by setting forth proof of:

(1) either the reposing of trust and confidence in the other party was justified, or the party in whom such confidence was reposed either invited, ostensibly accepted, or acquiesced in such trust; (2) the alleged trustee assumed a primary duty to represent the other party's interest in the subject of the transaction; (3) the nature and scope of the duty that arose by reason of the confidential relationship extended to the subject matter of the suit; and (4) that duty was violated, resulting in damage to the party reposing such confidence.

*Id.* at 67 (citing *First National Bank v. Theos,* 794 P.2d 1055 (Colo. App. 1990)).

However, as discussed throughout this Order, the Complaint does not establish that Defendants West and Penman orally agreed with Plaintiffs to jointly pursue property or other assets, nor does it establish that Defendants owed Plaintiffs fiduciary duties. *Cf. id.* ("Here, therefore, in order to escape the bar of the pertinent statute of frauds, it was necessary for plaintiffs to prove, among other things, that they reasonably reposed confidence and trust in Busby at the time of the negotiations leading to the oral agreement at issue and that, but for such confidential relationship, such oral agreement would have been reduced to writing"). Contrary to what Plaintiffs assert, the excerpts of the email exchange between them and Defendant West, *see infra*, do not necessarily evidence a joint venture or an oral contract between Plaintiffs and Defendant West, let alone the other named Defendants; rather, without additional factual allegations to provide necessary context, Defendants and the court are simply left to speculate as to if, and how, Plaintiffs might be excused from the statute of frauds as to some or all of Defendants.[8]

---

[8] Defendants also argue that even if Plaintiffs had alleged they entered into contracts with respect to the First, Second, and Third Transaction, the applicable statute of limitations has expired for each event. [#27 at 10]. Ordinarily, a statute of limitations argument is presented as an affirmative defense. The issue may be resolved on a Rule 12(b)(6) motion where the application of the limitations period "is apparent on the face of the complaint." *Dummar v. Lummis,* 543 F.3d 614, 619 (10th Cir. 2008) (citing *Aldrich v. McCulloch Properties., Inc.* 627 F.2d 1036, 1041 & n.4 (10th Cir. 1980)). Plaintiffs argue that they filed the Complaint "one day before

*Good Faith and Fair Dealing*.  Every contract in Colorado contains an implied duty of good faith and fair dealing.  *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003), *as modified on denial of reh'g* (May 19, 2003) (citations omitted).  Other than in unusual circumstances not present here, Colorado law does not recognize a claim for breach of the implied covenant of good faith and fair dealing independent of a contract.  *Id.*; *see also Farris v. ITT Cannon, a Div. of ITT Corp.*, 834 F. Supp. 1260, 1268 (D. Colo. 1993) (to assert a breach of the covenant of good faith and fair dealing there must be an underlying contract). In light of the above findings regarding the insufficient pleading of an oral or written contract, I conclude that Plaintiffs fail to state a claim for breach of the implied covenant of good faith and fair dealing.

2.  Unjust Enrichment.

To recover for unjust enrichment, the Tans must show that "(1) a benefit was conferred on the defendant by the plaintiff; (2) the benefit was appreciated by the defendant; and (3) the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment of its value."  *Does v. Rodriguez*, No. 06–cv–00805–LTB, 2007 WL 684117, at *5 (D. Colo. Mar. 2, 2007) (quoting *Humphrey v. O'Connor,* 940 P.2d 1015, 1021 (Colo. App. 1996)).  The Tans do not articulate precisely what benefit they conferred on which Defendant, or the circumstances that make it inequitable for that Defendant or those Defendants to retain the benefit.  As mentioned, the only monetary benefit they allege they provided as

---

three years from the date the Firehouse closing started and several days before three years when the closing was completed"; and that Defendant West assured them that Defendants "would abide by their promise to restructure or repay as late as 2015," thus, Plaintiffs did not discover that Defendants "intended to breach their promises until 2015." [#40 at 13].  The court declines to address the statute of limitations argument at this juncture, in light of the pleading deficiencies already identified.  Defendants may re-raise the argument at a later date, to the extent it remains applicable.

individuals is the $1 million advanced in the First Transaction, which was placed into escrow, associated with a contract between Mr. Waldron, Sr. and Ms. Gaetano, and which Ms. Gaetano apparently spent in part. As Defendants emphasize, neither Mr. Waldron, Sr. nor Ms. Gaetano is party to this action.

With respect to the advance of $350,000 in the Second Transaction, Plaintiffs allege that Evren is responsible for providing those funds. [#1 at ¶ 31]. Defendants argue that Evren, as a limited liability company, can sue and be sued, and Plaintiffs have alleged no standing that allows them to assert this claim on Evren's behalf. [#27 at 13]. The court agrees. *See In re Calderon*, 501 B.R. 726, 735 (D. Colo. 2013) (recognizing that it is a fundamental principle of corporate law that limited liability companies exist as entities legally distinct and independent from their individual owners); *see also* Colo. Rev. Stat. § 7-80-104(1)(a) (stating that limited liability companies have the capacity to sue and be sued).

### 3. Breach of Fiduciary Duty of Care and Loyalty

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Accident & Injury Med. Specialists, P.C. v. Mintz*, 279 P.3d 658, 663 (Colo. 2012) (en banc) (quoting *Moses v. Diocese of Colo.*, 863 P.2d 310, 321 (Colo. 1993) (en banc)); *see Walshe v. Zabors*, 178 F. Supp. 3d 1071, 1083 (D. Colo. 2016). To plead a common-law claim for breach of fiduciary duty, the Tans must allege that: (i) a fiduciary duty existed between them and Defendants; (ii) Defendants breached that duty; and (iii) the Tans were damaged as a result. *FDIC v. Refco Group, Ltd.*, 989 F. Supp. 1052, 1080 (D. Colo. 1997). Apart from the fiduciary relationships recognized as a matter of law, such as attorney-client or trustee-trust

beneficiary, "the Colorado Supreme Court has recognized a fiduciary relationship where one party occupied a superior position relative to another and assumed a duty to act in the dependent party's best interest and where one party had extensive influence and control over the other's interests." *Walshe*, 178 F. Supp. 3d at 1083. *See Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1162 (10th Cir. 2000) (recognizing that a variety of relationships can create fiduciary responsibilities, even where the relationships themselves are not *per se* fiduciary in nature and citing Colorado case law to emphasize that the existence of the duty depends on the facts and circumstances of the case) (citations omitted). Thus, business relationships involving parties dealing at arm's length for mutual benefits do not possess the elements necessary to create a fiduciary duty. *Mintz*, 279 P.3d at 663 (distinguishing between those types of relationships and "relationships that derive from a special relationship of trust, reliance, influence, and control") (citing *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 730 (10th Cir. 1991) ("[P]arties may deal at arms length for mutual profit without subjecting themselves to heightened fiduciary duties.")).

The Tans offer only the following allegations in support of this claim:

> Because of: (i) the monies the Tans and other investors advanced for the venture starting in 2010; (ii) West's positions as agent to Waldron, the venture, NAC, and Deep Blue and sub-agent to the Tans and the other investors; (iii) the parties' agreement concerning joint pursuit of the opportunities; and (iv) applicable law, the Defendants owed the Tans and the other investors fiduciary and other duties to treat them fairly, in good faith, with loyalty, and reasonable care and to undertake the purchase transactions for the benefit of the Tans and the other investors…

> Defendants owed Plaintiffs fiduciary duties due to either: (a) the trust and confidence the Individual Defendants induced Plaintiffs to place in the Defendants and which the Plaintiffs did in fact justifiably place in them; and/or (b) the Defendants' agency or sub-agency to Plaintiffs.

[#1 at ¶¶ 55, 89].  A fiduciary relationship must exist before it can be breached.  These allegations demonstrate merely that the Tans became involved in a business relationship with Defendants; there are no allegations in the Complaint that describe a "special relationship of trust, reliance, influence, and control."  For instance, what was the extent and nature of the trust and confidence the Tans placed in Defendants West and Penman, and how did those Defendants induce the Tans to rely on them.  Rather than assert those types of factual allegations, the Tans reference an email they exchanged with Defendant West in August 2013:

> We cannot fully realize all that has gone into achieving the results you have reaped. Simply juggling the money has been a full time task alone, and things could not have been accomplished without your tuning, tweaking, and shuffling all the moving financial pieces to the great puzzle of rolling that big old dinosaur of a greenhouse into the profit machine it has now become. No one else could have handled the control panel as you have done—expertly and without complaint. You have shown your patience, talent and wisdom in accomplishing a very difficult task, and produced truly staggering results. We are deeply grateful for your efforts.

[#1 at ¶ 32].  And Defendant West's response: "Thank you. The real thanks is what you, Pam, and Tom has [sic] done with guidance and supplying an endless amount of money. I know how hard that task is and was. It is called team work."  [*Id.*]  Standing alone, this exchange fails to establish a fiduciary relationship between Defendant West (or any of the other Defendants) and the Tans.  *Cf. Brodeur v. Amer. Home Assurance Co.*, 169 P.3d 139, 151 (Colo. 2007) (recognizing fiduciary duty where one party occupied a superior position relative to another and assumed a duty to act in the dependent party's best interest); *Paine, Webber, Jackson & Curtis, Inc. v. Adams,* 718 P.2d 508, 517–18 (Colo. 1986) (recognizing fiduciary duty where one party had extensive influence and control over the other's interests).  Instead, the exchange suggests an arms-length business transaction.

The court notes that these allegations do not preclude any possibility of finding that a fiduciary relationship existed between Defendants Penman and West and the Tans, indeed "a fiduciary duty may arise from a business or confidential relationship which impels or induces one party 'to relax the care and vigilance it would and should have ordinarily exercised in dealing with a stranger.'" *Atlantic Richfield Co.*, 226 F.3d at 1163 (citing *Dolton v. Capitol Fed. Sav. and Loan Ass'n,* 642 P.2d 21, 23 (Colo. App. 1981)). *See Page v. Clark*, 197 Colo. 306, 316 (1979) ("A confidential relationship arises when one party has justifiably reposed confidence in another."). However, there simply exist too few allegations in the Complaint for the court to find that the Tans have pled such a relationship.[9]

### 4. Promissory Estoppel

To plead a promissory estoppel claim, the Tans must allege (1) a promise which a Defendant reasonably expected would induce action or forbearance of a definite and substantial character on the part of the Tans; (2) action or forbearance induced by that promise; and (3) the existence of circumstances such that injustice can be avoided only by enforcement of the promise. *Nelson v. Elway,* 908 P.2d 102, 110 (Colo. 1995). "The presence of these elements will prevent the lack of a written contract from defeating a plaintiff's claim." *Id.* In addition to the Promises identified above, the Tans reference the following promise in the Complaint:

> The Tans reasonably believed West and Penman when they promised that they (and Det-CO) would restructure ownership in the entity to reflect the 80/20 Split agreed to by the parties once the purchase had closed and approvals for such a license transfer were obtained…

---

[9] Defendants argue applicability of the statute of limitations for this claim, and Plaintiffs re-raise their argument that the claim is timely. As with the breach of contract claim, I decline to pass on Defendants' argument at this time and they may re-assert the argument at a later date if appropriate.

West assured Plaintiffs on several occasions through 2015 that West and Penman acted the way they did to protect the Tans and the other investors and that the Defendants would make sure the investors received their equity interests or a return of their money, with interest.

[#1 at ¶¶ 47, 56]. I find that of the claims asserted, the Tans come closest to stating a cognizable claim for promissory estoppel. Ultimately, however, the Tans fail to assert factual allegations, taken as true, that demonstrate an action or forbearance of action that Defendant West reasonably expected to induce. Based on the Tans' own response, it is entirely unclear whether they individually, or through Evren, provided any money to Defendants West and Penman, who allegedly made the promises. [#40 at 14]. And while they suggest that they would not have agreed to the transaction but for the alleged promises and assurances by Defendants West and Penman, they do not allege what forbearance they undertook to their detriment.

5. Aiding and Abetting

The Tans assert that Defendants are liable for aiding and abetting each other's breaches of fiduciary duty. [#1 at ¶¶ 95-97]. Colorado law recognizes liability for aiding and abetting as follows:

Liability for aiding or abetting a tortious act will be found if the party whom the defendant aids performs a wrongful act that causes an injury, the defendant is generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance, and the defendant knowingly and substantially assists the principal violation.

*Holmes v. Young,* 885 P.2d 305, 308 (Colo. App. 1994) (citations omitted). *See Sender v. Mann*, 423 F. Supp. 2d 1155, 1176 (D. Colo. 2006) (citing *Nelson,* 971 P.2d at 249–250). Allegations of wrongful intent are not required; it is sufficient to allege that the defendant "knew of the breach of duty and participated in it." *Id.* (quoting *Holmes,* 885 P.2d at 309). In light of my finding above that Plaintiffs have not alleged that a fiduciary relationship existed between

themselves and Defendants, I necessarily find they fail to state a claim for aiding and abetting. *See Holmes*, 885 P.2d at 308-09 ("In jurisdictions which have recognized the tort of aiding and abetting a breach of fiduciary duty, the plaintiff must prove each of the following elements: '(1) breach by a fiduciary of a duty owed to plaintiff, (2) defendant's knowing participation in the breach, and (3) damages.'") (citations omitted). Furthermore, even if Plaintiffs had stated a claim for breach of fiduciary duty, they fail to allege that Defendants acted with the requisite knowledge to assist in the tortious activity.

### 6. Civil Conspiracy

To plead civil conspiracy under Colorado law, the Tans must allege the following: "(1) two or more persons, and for this purpose a corporation is a person; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Jet Courier Service, Inc. v. Mulei,* 771 P.2d 486, 502 (Colo. 1989). The Tans allege that Defendants West and Penman "reached an agreement to usurp and convert the Firehouse, Rino, and Isabelle Property opportunities by taking nominal title to the entities and/or properties and refusing to recognize the Promises and/or the advances by Plaintiffs," and that they took "several unlawful acts to accomplish that goal and/or several lawful acts to accomplish the unlawful objective of taking the opportunities, and caused Plaintiffs to suffer damages as a result." [#1 at ¶ 98].

Even if this single allegation could establish the first three elements of the claim, which is not entirely clear, *see Nelson*, 908 P.2d at 106 ("The court will not infer the agreement necessary to form a conspiracy; evidence of such an agreement must be presented by the plaintiff"), it is insufficient to establish the fourth. The Complaint provides no description or other factual

allegation to give notice as to what unlawful acts Defendants Penman and West engaged in. *See id.* ("While the petitioners do allege that Pico, as the agent of Metro Toyota, breached his fiduciary duty to the petitioners, this alone does not give rise to a claim for relief against the respondents. Without an allegation that the respondents committed, or participated in the commission of, an unlawful overt act, conspiracy liability may not be imposed").[10] And, to the extent Plaintiffs would argue that those Defendants engaged in fraud, any fraudulent acts must be pled under the standard of Rule 9(b). *See* Fed. R. Civ. P. 9(b). *See also In re Qwest Communications International, Inc. Securities Litigation*, 387 F. Supp. 1130, 1153 (D. Colo. 2005).

### 7. Conversion/Civil Theft

Plaintiffs allege that Defendants are liable for common law conversion and/or civil theft under Colo. Rev. Stat. § 18-4-405 in that they "improperly committed distinct, unauthorized acts of dominion or ownership over the equity in the Firehouse Defendants, Rino, and Isabelle Property as against the Plaintiffs, which deprived the Plaintiffs of their lawful rights and uses of the equity and property and caused Plaintiffs to suffer damages." [#1 at ¶¶ 100, 101]. "Conversion is defined as any distinct, unauthorized act of dominion or ownership exercised by one person over personal property belonging to another." *Glenn Arms Assocs. v. Century Mortg. and Investment Corp.,* 680 P.2d 1315, 1317 (Colo. App. 1984). Thus, to state a claim for conversion under Colorado law, the Tans must allege that a Defendant exercised dominion or control over property that belonged to the Tans; the Defendant's exercise of control was

---

[10] The Complaint purports to assert two claims for civil conspiracy, but it appears that the paragraphs associated with Claim Seven for Civil Conspiracy actually support Claim Six for Aiding and Abetting, and that Claim Eight for Civil Conspiracy is the sole assertion of that theory of liability. *See* [#1 at 18].

unauthorized; the Tans demanded return of the property; and the Defendant refused to return it. *See, e.g., id.* The Complaint simply fails to allege facts to support many of these elements. As addressed throughout this Order, Plaintiffs fail to sufficiently allege ownership in the Firehouse Defendants, Rino, or the Isabelle Property. The only property that Plaintiffs allege belonged to them is the $1 million identified in reference to the First Transaction, and those funds were placed into escrow and allegedly spent by Ms. Gataeno. *Cf. id.* (holding elements for claim of conversion met where converter had not performed in accord with terms of contract and had placed funds to be escrowed elsewhere than in escrow, thereby exercising dominion over funds, and subsequently twice refused return of such funds). However, Ms. Gataeno is not a party to this action. I find that Plaintiffs fail to state a claim for conversion.[11]

I similarly find that Plaintiffs fail to state a claim for civil theft, which is demonstrated by alleging that (1) the defendant knowingly obtained control over the plaintiff's property without authorization, or by threat or deception, (2) with the specific intent to permanently deprive the plaintiff of the benefit of the property. Colo. Rev. Stat. § 18-4-401(1)(a); *West v. Roberts*, 143 P.3d 1037, 1040 (Colo. 2006). In addition to Plaintiffs' failure to allege ownership over the three properties, they do not allege that Defendants acted with the intent of depriving them of that ownership interest. *See Phelps Oil and Gas, LLC v. Noble Energy, Inc.*, No. 14–cv–2604–REB–CBS, 2016 WL 9735740, at *3 (D. Colo. Sept. 28, 2016) (adopting recommendation that plaintiff had failed to state a claim for conversion and civil theft because the allegations "fail to identify specific property *owned by Phelps* which was taken by DCP when DCP undertook the actions alleged in the complaint") (emphasis in original). *See also Greenway University, Inc. v.*

---

[11] The Parties argue applicability of the statute of limitations for this claim as well and I again decline to pass on it. Defendants may re-assert the argument at a later date if appropriate.

*Greenway of Arizona, LLC*, No. 11–cv–01055–RBJ–KLM, 2012 WL 1801948, at * 10 (D. Colo. May 17, 2012) (dismissing as conclusory civil theft claim that alleged merely, "[d]efendants knowingly obtained and retained the value of Greenway's text, and trademarks and of income from Greenway's customers through theft and deception, constituting civil theft pursuant to C.R.S. § 18–4–401(1)(a).").

8. <u>Declaratory Relief</u>

Finally, I address Plaintiffs' claim for declaratory judgment under 28 U.S.C. §2201. Specifically, Plaintiffs ask the court to "declare the parties respective ownership interests in in [sic] defendant Det-CO, defendant Rino, and/or with respect to the Isabella Property [sic]," to include without limitation, "transfer of ownership pursuant to the declaration reached by the Court." [#1 at ¶ 74]. The availability of a declaratory judgment under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, depends upon the existence of a judicially remediable right. *West Maui Properties, LLC v. Deutsche Bank Trust Company Americas*, No. 16–cv– 01646–LTB–KLM, 2016 WL 10518587, at * (D. Colo. Dec. 22, 2016) (citing *See Hurd v. BAC Home Loans Servicing, LP*, 880 F. Supp. 2d 747, 769 (N.D. Tex. 2012)). *See Schilling v. Rogers,* 363 U.S. 666, 677 (1960) (the availability of relief under the Declaratory Judgments Act presupposes the existence of a judicially remediable right). Because I find that Plaintiffs fail to state a claim for which relief may be granted, I necessarily conclude that their claim for declaratory judgment based on those claims and contentions must fail as well.

## III. **Failure to Join Indispensable Parties**

Lastly, Defendants contend that the following individuals and entities are indispensable to this action: Mr. Waldron, Sr.; Mr. Waldron, Jr.; Ms. Gataeno; Star-Tek; Evren; NAC; and

Deep Blue. [#27 at 17]. Plaintiffs disagree, and assert several arguments in response, including: the nonparties are joint tortfeasors and thus Plaintiffs may exercise discretion in choosing whether to name them; Defendants bear the burden of demonstrating that the nonparties have an interest that will be compromised in their absence, and they fail to adequately do so in their Motion; and Defendants fail to offer evidence regarding the citizenship of the nonparties. [#40 at 19-21]. In Reply, Defendants reference *Waldron v. West* as evidence that Mr. Waldron, Jr. is a citizen of Florida, and that the nonparties, or at least Mr. Waldron, Jr., NAC, and Deep Blue, claim "an actual interest in the very same transactions and the Isabelle Property in which Plaintiffs are claiming an interest in this suit." [#53 at 4-5]. Additionally, Defendants argue, Plaintiffs maintain they advanced $350,000 through Evren to NAC and Deep Blue to develop the Isabelle Property, and NAC and Deep Blue assert in *Waldron v. West* an interest in the Isabelle Property. [*Id.* at 5]. The court declines to pass on this argument at this time in light of the pleading deficiencies identified above. Without a better definition of the claims, this court cannot properly determine if nonparties are necessary or indispensable, as the analysis is necessarily claim-specific.

Finally, Plaintiffs seek leave to supplement their pleading should the court identify deficiencies, *see* [#40 at 18], and the court finds that leave to amend is appropriate. As Plaintiffs note, no Scheduling Order has been entered and no discovery has been taken. But in light of the amount of time that has elapsed from the initial transactions, and the state court litigation referenced by the Parties, this court will permit only a limited amount of time for amendment, as Plaintiffs should already have in their possession the factual allegations necessary to amend. Accordingly, to the extent Plaintiffs can correct the deficiencies discussed herein, the court will

permit them leave to amend no later than **March 2, 2018**.  In so permitting, the court strongly encourages Plaintiffs to analyze the legal viability of each of their claims, rather than indiscriminately reassert them, and to pay particular attention to this court's subject matter jurisdiction, which cannot be waived.  To the extent Plaintiffs file an Amended Complaint, any new defendants must be served within fourteen (14) days of the filing, and the defendants named in the Amended Complaint may thereafter answer or otherwise respond as appropriate in accordance with the Federal Rules of Civil Procedure and the Local Rules of Practice for this District.

For the foregoing reasons, **IT IS ORDERED** that:

1. The Motion to Dismiss Or, Alternatively, For a More Definite Statement and Incorporated Memorandum of Law [#27] is **GRANTED**;

2. Plaintiffs are permitted leave to amend their Complaint, and they shall file any amended complaint on or before **March 2, 2018**; and

3. The Scheduling Conference set for March 20, 2018 is **VACATED**, to be reset at a later date, if appropriate.


DATED: February 15, 2018                    BY THE COURT:


                                            s/Nina Y. Wang_____
                                            United States Magistrate Judge